17676

Mrs. Pearl S. WEST, Mrs. Carolyn W. Dickson, and Mrs. Hazel W. Stoddard, Appellants, v. CITY OF SPARTANBURG, and The South Carolina Workmen's Compensation Fund, Respondents

(115 S. E. (2d) 295)

554

*C. Yates Brown, Esq.,* of Spartanburg, *for Appellants,*

*Messrs. Daniel R. McLeod, Attorney General,* and *David Aiken, Assistant Attorney General,* of Columbia, *for Respondents,*

July 5, 1960.

LEGGE, Justice.

On October 18, 1958, while engaged in the performance of the duties of his employment as jailer at the Spartanburg city jail, Joe West suffered a coronary thrombosis, from which he died while being taken to the hospital. In this proceeding under the workmen's compensation law the hearing Commissioner awarded compensation for his death; and a majority of the Commission affirmed. Appeal from the Commission was heard before the Honorable Bruce Littlejohn, resident Judge of the Seventh Circuit, who by his order of December 5, 1959, concluded that the award was without evidentiary support, and set it aside. From that order claimants appeal.

Mr. West had been in the employ of the City of Spartan-
burg for more than twenty years prior to his death. On Au-
gust 1, 1957, in the course of his work in the city's depart-
ment of sanitation, he had a heart attack, as the result of
which he was confined to his home and unable to work for
several months. From the testimony of Mr. Creighton, the
city's workmen's compensation adjuster, a witness for the
claimants, it appears that a day or so after he had been taken
ill Mr. West had told his (West's) assistant to report the
matter to Creighton, but that the assistant had not done so,
and it was not brought to Creighton's attention until after
the lapse of about three months. The city, insured in the
State Workmen's Compensation Fund, made its "First Re-
port" to the Industrial Commission on December 25, 1957;
and a "Closing Report", showing denial of liability, was filed
on March 25, 1958. No claim for compensation was made.
During his disability the city continued to pay Mr. West his
full salary; and he returned to work on January 15, 1958. In
April or May of that year he was transferred from the sani-
tation department to the police department as jailer.

The facts immediately prior to and at the time of Mr.
West's fatal seizure are not in dispute. They were testified
to by the lieutenant and four other members of the police
force, all of whom appeared as witnesses for the claimants.
From their testimony it appears that the evening of October
18, 1958, a Saturday, was a very busy one at the city jail
by reason of the fact that a number of boisterous drunken
prisoners were being brought in to be locked up.

Lieutenant Hayes testified as follows:

The witness and Officer Green came up to the jail with
two prisoners, but kept them outside, near the front door,
until some "boisterous, loud, cursing drunks" that had al-
ready been brought in could be attended to by the officers on
the inside. While Hayes and Green were thus waiting, Mr.
West came out of the door and said that he was sick. Telling
Mr. West to wait outside for him, Hayes took his prisoner

in and turned him over to the other officers but before he could get back to him Mr. West had fallen to the ground. Hayes and Green rushed him to the hospital in a police car, and he was dead when they reached the emergency room. Mr. West had nothing to do with the handling of the prisoners physically; his job was to accompany the police officer and the prisoner in his charge to the appropriate cell, unlock its door, and lock it after the prisoner had been put inside by the officer. On the evening in question Lieutenant Hayes was at the jail "a good bit of the time, in and out." Most of Mr. West's work was on the ground floor, where the cells for male prisoners are located; and only once or twice did he have to accompany an officer with a female prisoner to the women's ward on the next floor above.

Private Lineberry testified: that on the evening in question, shortly after he and Officer Kloskey had entered the jail with two prisoners, he saw Mr. West, who was returning from having locked a prisoner in "solitary", hand his keys to Officer Green, saying that he was sick and was going outside "to get some air"; and that, for about a half-hour before Mr. West had complained of being sick, officers had been bringing in drunken and disorderly prisoners and there had been much confusion and noise. This witness stated on cross examination that Mr. West had had nothing to do with the prisoners that he and Kloskey had brought in, as before mentioned; and there is no suggestion in his testimony that Mr. West had physical contact with any of the other prisoners that evening.

Officer Kloskey testified, on direct examination: that he was having trouble with his boisterous prisoner, who was handcuffed and whom he wanted put in the "solitary" section, which consisted of two cells; that, both of said cells being occupied at that time. Mr. West said that one of them would have to be emptied of its occupant, who was sleeping; that another officer came and removed the sleeper, and he (Kloskey) put his prisoner in the cell, the door of which Mr. West had unlocked; and that a few minutes later he

was told that Mr. West was sick and was being taken to the hospital. On cross examination he testified that Mr. West had nothing to do with the physical handling of the prisoners, that being done by the police officers.

Officer Green testified: that on the evening in question he came to the jail with a prisoner; that prior to that time he had not been at the jail that evening; that when he arrived, with his prisoner, there was much confusion and noise and cursing; that after about ten minutes Mr. West, who had been out when the witness and his prisoner had arrived, came in, in the midst of this confusion; that when Green told him that he had a prisoner to be locked up West replied that he was sick and had to get outside, and he thereupon handed his keys to Green, who told him that he would "take care of it for him". And, on cross examination: that, so far as the prisoners and the officers were concerned, the evening was unusually "rough" because of the noise and confusion and boisterous conduct of the prisoners; but that Mr. West was doing no more, physically, than his usual work and, to the best of Green's knowledge, was not in physical contact with any of the prisoners.

Officer Timmons testified that while he was booking a prisoner at the desk Mr. West, who had been in the rear part of the jail with some officers, locking up prisoners, came up, and that Timmons asked him to get some cigarettes for his prisoner, who had given Timmons some money for that purpose; that Mr. West had replied that he was sick and that Timmons would have to get somebody else to do it, because he (West) had to get out and get some fresh air; and that shortly thereafter Timmons, who had locked up his prisoner, learned that Mr. West had fallen in the yard and was being taken to the hospital. On cross examination: that so far as he could say, not having been at the jail continuously that evening, Mr. West's work then involved no more physical exertion than was usually incident to his duties as jailer.

In *Price v. B. F. Shaw Co.*, 224 S. C. 89, 77 S. E. (2d) 491, and *Sims v. S. C. State Commission of Forestry*, 235

S. C. 1, 109 S. E. (2d) 701, evidence of unusual strain or exertion was declared essential to support an award for disability or death resulting from aggravation of heart trouble. The absence of such evidence here requires affirmance of the judgment below, and distinguishes the instant case from *Kearse v. S. C. Wildlife Resources Department,* S. C., 115 S. E. (2d) 183, where disability from a cerebral thrombosis precipitated by unusual strain and exertion in the performance of the claimant's duties as game warden was held compensable.

Affirmed.

STUKES, C. J., and TAYLOR, OXNER and MOSS, JJ., concur.