17794

Harry O. WALSH, Respondent, v. U. S. RUBBER COMPANY and Winnsboro Mills, Appellants

(120 S. E. (2d) 685)

*T. K. McDonald, Esq.,* of Winnsboro, *for Appellant,*

*John A. Martin, Esq.,* of Winnsboro, *for Respondent,*

June 5, 1961.

Moss, Justice.

This is a proceeding for compensation under the Workmen's Compensation Act, section 72-1 *et seq.,* Code of 1952, instituted by Harry O. Walsh, the respondent, against U. S. Rubber Company, employer, and a Self-Insurer, appellant. It is an appeal from an order of the Circuit Court affirming an award of compensation made by the Industrial Commission.

Harry O. Walsh, fifty-one years of age, had been in the employ of the appellant since February 1956, as a stock room operator. It appears, while engaged in the performance of the duties of his employment, he suffered what one of the physicians described as a posterior myocardial infarction and, thereafter, refered to in the testimony as a heart attack. In this proceeding, the hearing Commissioner found that the respondent "did sustain an injury by accident arising out of

and in the course of his employment, * * * due to over-exertion, strain and tension * * * ." A majority of the Commission affirmed this finding of fact. An appeal from the order of the Commission was heard before the Honorable George T. Gregory, Jr., Resident Judge of the Sixth Circuit, who by his order of August 26, 1960, affirmed the opinion and award of a majority of the Commission. Timely appeal to this Court followed.

The appellant asserts that the respondent did not comply with section 72-301 of the 1952 Code of Laws of South Carolina, with reference to giving written notice to the employer of his alleged accident, within thirty days after the occurrence thereof. The Commission found that the respondent did not give written notice of his accident within thirty days after it occurred, but he was excused from doing so because of his physical incapacity, and that appellant was not prejudiced thereby. This finding was affirmed by the Circuit Judge. The appellant asserts that this finding was erroneous because failure to give the notice was prejudicial to its rights and there was no competent evidence adduced indicating that the respondent was prevented from giving timely notice.

Section 72-301 of the 1952 Code of Laws provides that every injured employee shall immediately on the occurrence of an accident give or cause to be given to the employer a written notice thereof and the employee shall not be entitled to physician's fees nor to compensation prior to the giving of such notice, unless it can be shown that the employer had knowledge of the accident or the party required to give such notice had been prevented from doing so by reason of physical incapacity. The cited section then provides:

"* * * But no compensation shall be payable unless such written notice is given within thirty days after the occurrence of the accident or death, unless reasonable excuse is made to the satisfaction of the Commission for not giving such notice and the Commission is satisfied that the employer has not been prejudiced thereby."

The respondent testified that at about 11:00 o'clock a. m., on December 29, 1958, while at work, "I became weak, felt terrible; I don't know, I have never felt like that before in my life." He said he "felt like I had stifling smoke here in my chest." He also testified that his condition continued to get worse. He testified also that he was trying to do his normal work but because of his condition he changed to sewing samples for the rest of the day. He went home at 3:00 o'clock and went to bed. He says that at 2:00 o'clock a. m. on the next morning that he had a headache, was weak, and perspiring. At about 6:30 o'clock on that morning he had his physician called, and thereafter his physician came to see him about 8:30 o'clock, and immediately directed that the respondent be placed in a hospital The respondent was taken to the Fort Jackson Hospital at Columbia, South Carolina, because he was a veteran and entitled to treatment in the government hospital. He remained as a patient in the hospital for twenty-nine days, and upon his return home he was a bed patient for about two weeks. He testified the first day he was able to leave his home that he went to the office of appellant and there he told Noel Williams, the industrial relations manager of appellant, about the heart attack he had on the last day he worked. He testified also that Williams would not allow him to file a claim for compensation because he was not entitled to such. He says that, thereafter, he did, on February 20, 1959, file a formal claim for compensation with the Industrial Commission in Columbia. Williams admitted that the respondent came to see him "during the first half of February" and he said their denial of liability was based on the fact that the respondent had not reported any accident or injury to the appellant. He also testified that the appellant had been prejudiced by the failure of the respondent to give notice of his claim within thirty days. He says, "We would have been in a better position to investigate the matter had he told us earlier. Yes, we have been prejudiced, in my opinion." Upon this testimony the hearing Commissioner found that there was a rea-

sonable excuse for the failure of the respondent to give notice of the accident within the time required by Section 72-301 of the Code, and that the employer was not prejudiced by the delay in giving the required notice. There is competent evidence to support the factual findings made by the Commission upon this issue. They are binding upon this Court. *Raley v. City of Camden,* 222 S. C. 303, 72 S. E. (2d) 572 and *Gray v. Laurens Mill et al.,* 233 S. C. 421, 105 S. E. (2d) 409. This exception is overruled.

The next question for determination is whether there is evidence to support the award of the Industrial Commission holding that the respondent had suffered an accident arising out of and in the course of his employment, within the meaning of section 72-14 of the Workmen's Compensation Act.

It is the law of this State that a claimant must establish by the preponderance of the evidence the facts which will entitle him to an award under the Workmen's Compensation Act. *Fowler v. Abbott Motor Co. et al.,* 236 S. C. 226, 113 S. E. (2d) 737; and *Glover v. Columbia Hospital,* 236 S. C. 410, 114 S. E. (2d) 565. We have also held that in workmen's compensation cases the Industrial Commission is the fact-finding body; and this Court and the Circuit Court, both being Appellate Courts in workmen's compenation matters, can only review the facts to determine whether or not there is any competent evidence to support the findings of the fact-finding body. If there is, both this Court and the Circuit Court are without power to pass upon the force and effect of such evidence. When there is a conflict in the evidence, either of different witnesses or of the same witness, the findings of fact of the Industrial Commission, as triers of fact, are conclusive. *Steed et al. v. Mount Pleasant Seafood Co. et al.,* 236 S. C. 253, 113 S. E. (2d) 827, and the cases therein cited.

We think the evidence in this case is conclusive that the respondent suffered "a heart attack" with ensuing disability.

The question for determination is whether the heart attack suffered by the respondent constitutes a compensable accident within the meaning of Section 72-14 of the 1952 Code. The appellant asserts that the respondent, at the time of his disabling heart attack, was engaged in his usual work and was not subjected to any unusual or unexpected strain, or over-exertion in the performance of the duties of his employment, or by any unusual and extraordinary conditions thereof. The respondent contends to the contrary.

In the case of *Kearse v. South Carolina Wildlife Resources Department*, 236 S. C. 540, 115 S. E. (2d) 183, 185 this Court, in a well considered opinion by Justice Oxner, said:

"* * * A determination of this question necessitates a review of the cases where disability or death of an employee results as a consequence of exertions in the performance of his duties. It is now well settled in this State that a coronary occlusion or thrombosis suffered by an employee constitutes a compensable 'accident' if it is induced by unexpected strain or over-exertion in the performance of the duties of his employment or by unusual and extraordinary conditions in the employment. *Green v. City of Bennettsville,* 197 S. C. 313, 15 S. E. (2d) 334; *Willis v. Aiken County,* 203 S. C. 96, 26 S. E. (2d) 313; *Windham v. City of Florence,* 221 S. C. 350, 70 S. E. (2d) 553. This is true even though there is a preexisting pathology which may have been a contributing factor. *Sweatt v. Marlboro Cotton Mills,* 206 S. C. 476, 34 S. E. (2d) 762; *Raley v. City of Camden,* 222 S. C. 303, 72 S. E. (2d) 572. And the right to compensation is not affected by the fact that the unusual or excessive strain which precipitates the heart attack occurs while the employee is performing work of the same general type as that in which he is regularly involved. *Sweatt v. Marlboro Cotton Mills, supra,* 206 S. C. 476, 34 S. E. (2d) 762; *Ricker v. Village Management Corporation,* 231 S. C. 47, 97 S. E. (2d) 83. The phrase 'unusual or excessive strain' used in many of the

cases, is not so limited in its meaning as to include only work of an entirely different character from that customarily done."

We have also held that if a heart attack results as a consequence of the ordinary exertion that is required in the performance of the duties of the employment in the ordinary and usual manner, and without any outward untoward event, it is not compensable as an accident. The fact that due to a weakened heart condition, the exertion required for the ordinary performance of the work is too great for the particular employee, who undertakes to perform it, does not make it a compensable accident. *Sims v. South Carolina State Commission of Forestry*, 235 S. C. 1, 109 S. E. (2d) 701.

The testimony shows that the respondent was a stock room operator for the appellant. He had to do mainly with the handling of Trilok, which is a fabric used for the purpose of upholstering automobiles. He was required to make up samples thereof and display them. He did cutting and sewing of these samples, and at times, according to his testimony, he had to lift rolls which weighed fifty to one hundred pounds, but, according to the testimony of one of the witnesses for the appellant, these samples would never weigh over thirty-five pounds. The respondent testified that on December 28, 1958, he planned the work that he was to do on the next day, which consisted of getting a large order of some large cutouts and makeup samples on automobile materials, which required a great deal of lifting and carrying from back of the sample room, laying on the table, cutting, sewing and shipping. He testified that he went to work at 7:00 o'clock in the morning and performed this work until about 8:00 o'clock at which time he was interrupted and told to lay out various other fabrics to be witnessed by a group of the officers of the respondent and some of the inspectors from the cloth room. When doing this, it was necessary to go from his place of work into a basement in another building a distance of one hundred and fifty yards. He says that

this went on for approximately two hours and he then returned to his other work, after getting all the other material put away. He says there were eight or ten officers of the appellant who came in during this period of time.

We quote from the testimony of the respondent, as to what took place on December 29, 1958:

"Q. Now, did that happen while you were in the process of carrying these heavy samples back and forth? A. It did happen during that time.

"Q. During that period of time? Well, now, this day that you had—or worked up until the time you had this feeling in your chest and became weak. Now, what sort of day was it compared to the average working day that you have? A. Well, it was quite unusual from the average working day. It was interruption and, naturally so many interruptions on to what I was doing at the time until it certainly just broke up the whole day for me and worried me in that manner.

"Q. Well, what would you say in reference to the lifting that you did before these officials came in, and the running around and lifting while they were there, and then the lifting that you did up until you have this feeling that you described in your chest? A. I felt all right; I mean, I'd been a vigorous worker and it had never bothered me before to lift those rolls; I had never had any effects from anything like that before.

"Q. Well, up to this point had you lifted more and done more than a usual, normal working day, or less? A. Well, I'll say that I got behind and tried to catch up; I tried to get this order out. I had my plans to get this order shipped. Both Mr. Goforth and Mr. Shell insist on trying to get their orders out one ahead of the other all the time; and I had tried my best to go to bat and get the thing on out where I could get to work on something else.

"Q. So you had had their approximate two-hour interruption from your normal plans, and then after the two hours

you were working— A. That's right, had to double up to try to—

"Q. You were doubling up, trying to double up and catch up, and trying to fulfil your regular schedule that you'd already planned for the day; is that correct? A. That's right."

Bobby Reynolds, a shipping clerk for the appellant, testified that he had occasion, shortly before 12:00 o'clock on December 29, 1958, to see the respondent in his workroom. He testified that the respondent looked pale, and was "sweating pretty hard." He testified that because of the appearance of the respondent he inquired as to how he felt and the respondent said he was feeling mighty bad. He testified on cross-examination that the respondent did not tell him he had had any accident nor that he was lifting something heavy and had a heart attack.

Roger Wilkinson, a witness for the appellant, testified that he was overseer of the cloth and Trilok sample department, and the respondent was under his supervision. He says that he visited the room where the respondent worked between 11:00 and 12:00 o'clock on December 29, 1958, and the respondent made no complaint to him about feeling bad. This witness also testified that there was nothing extraordinary about the duties required of him on that day. He says that it was just an ordinary day. He further testified that there was nothing unusual about officials of the company going into the stock room to inspect and examine special samples of materials. He testified that this occurred about twice each week.

Henry E. Goforth, a designer for the appellant, testified that he was in the room where the respondent worked several times on the day in question and that he saw nothing unusual about the work nor did the respondent complain to him that he was hurt or sick.

Dr. D. J. Turell, a heart specialist, and a Captain in the United States Army Medical Corps, stationed at Fort Jack-

son, Columbia, South Carolina, testified that he saw the respondent about noontime on December 30, 1958, at which time he was complaining of chest pains and shortness of breath. He testified that the respondent had a rapid pulse and low blood pressure. He says that a cardiogram was made and showed that the respondent had suffered a recent posterior myocardial infarction. He testified that in his opinion he had suffered this attack twelve to twenty-four hours prior to the time of examination. This witness, in response to a hypothetical question, giving the facts as established, testified that the work that day contributed to the respondent's heart attack, either as a cause or as an aggravation. This witness also testified that the respondent gave him a history of having some chest pains and shortness of breath while on a hunting trip the week before this attack. It was his opinion that the work done on December 29, 1958, most probably aggravated what was already going on prior to going to work that day. He also testified that where a person suffers an infarction of the heart there is usually a pre-existing coronary condition and the coronary occurrences do not have their onset suddenly but the progress of the coronary development is gradual.

Dr. John C. Buchanan, Jr., testified that he was the physician for the appellant and the respondent. He says that he saw the respondent on the morning of December 30, 1958, and after examining him he was of the opinion that the respondent had a coronary occlusion. This witness testified that he had heard the testimony of the respondent as to what work he did on December 29, 1958, and that he had visited the place where the respondent worked and picked up the things that he picked up and would say that the type of work was not a factor in bringing on his heart condition. This witness further testified that he had been informed that the respondent had been on a hunting trip the previous week and there had been some mention of pain in his chest during such trip. He testified that if his heart was damaged at the

time he was doing his work, that lifting could have aggravated his condition.

Dr. O. B. Mayer, a heart specialist, testified that he had never examined the respondent, but in answer to a hypothetical question stating the established facts, it was his opinion that the heart attack of the respondent was unrelated to his work.

We think that under the unusual exertion or strain rule there is evidence to sustain the finding of the Industrial Commission. There is some evidence that the activities of the claimant on the day of his heart attack were of a nature usually performed by him as a stock room operator. However, there is evidence that on the day in question his work environment was unusually difficult because of the interruption of his ordinary and normal routine by the officials of the appellant for a period of approximately two hours. There is evidence that because of such interruption that the claimant had to "double up" in an effort to fulfill his regular scheduled work. It is inferable from the testimony, because of these unusual circumstances, the claimant overexerted himself in the performance of his duties. The finding by a majority of the Industrial Commission, affirmed by the Circuit Court, sustains the conclusion that the heart attack suffered by the claimant constitutes a compensable "accident" because it was induced by unusual strain and overexertion on the part of the claimant in the performance of his employment. *Sweatt et al. v. Marlboro Cotton Mills et al.,* 206 S. C. 476, 34 S. E. (2d) 762; *Green v. City of Bennettsville,* 197 S. C. 313, 15 S. E. (2d) 334; *Ricker v. Village Management Corp. et al.,* 231 S. C. 47, 97 S. E. (2d) 83, and *Kearse v. South Carolina Wildlife Resources Department, supra.* We likewise think there was evidence to sustain the conclusion of the Industrial Commission that the claimant was totally disabled by reason of his heart condition. The exceptions of the appellant posing these questions are overruled.

The opinion and award of the single Commissioner in this case was filed on November 17, 1959. The appellant made application to the full Industrial Commission for a review of the single Commissioner's award on November 30, 1959. The award of the single Commissioner was affirmed by a majority of the full Commission on March 3, 1960. The appellant appealed to the Court of Common Pleas by the service of a proper notice and grounds on March 21, 1960. The order of the Circuit Court affirming the full Commission was filed August 26, 1960.

It appears that on May 31, 1960, the appellant applied to the Industrial Commission to stop compensation payments on the ground that suitable employment had been offered the claimant. The appellant sought to invoke the provision of Section 72-170 of the 1952 Code of Laws which provides that if an injured employee refuses employment procured for him suitable to his capacity, and approved by the Commission, he shall not be entitled to any compensation at any time during the continuance of such refusal. It appears that on July 19, 1960, pursuant to such application, a hearing was had before a single Commissioner upon the application made by the appellant. Thereafter, the single Commissioner, without filing a formal order, notified the attorney for the appellant that he had no jurisdiction of the matter because the award of the majority of the full Commission was on appeal to the Circuit Court. Apparently there was no appeal from the informal order of the single Commissioner to the Industrial Commission.

On August 12, 1960, the claimant filed a petition in the Circuit Court asking for an order requiring the appellant to show cause why disability payments should not be brought up to date and continued until terminated by proper order. The trial Judge issued a Rule to Show Cause why the prayer of the petition should not be granted. By way of return to this Rule, the appellant asserted that it had paid to the claimant compensation until May 15, 1960, and that on May 11,

1960, the claimant was offered employment by the appellant at a rate of pay equal to what he averaged during his last year's employment with it. It was further asserted that the appellant filed with the Industrial Commission a request that future compensation payments be discontinued until it could be determined whether the claimant would accept the said offer of employment. It was further asserted that the offer of employment was made in good faith and the issue made thereabout had not been determined by the Industrial Commission for the reason that the single Commissioner had notified the attorney for the appellant that he had no jurisdiction because of the pending appeal to the Circuit Court.

The trial Judge, in accordance with the decision of this Court in the case of *Case v. Hermitage Cotton Mills,* 236 S. C. 515, 115 S. E. (2d) 57, directed the appellant to pay claimant the temporary total disability payments which have accrued since May 15, 1960, and to continue such payments until such were properly terminated.

The appellant charges that it was error on the part of the commission and the Circuit Judge in failing to determine whether the claimant should be required to accept the appellant's offer of employment. We do not think that this question is properly before us for decision.

It appears from the record that the appellant had paid to the claimant weekly compensation at the compensable rate from the date of claimant's injury to May 15, 1960, as the result of an award made by the Commission. It is provided in Section 72-352 of the 1952 Code, that where compensation has been paid or is due in accordance with an award and the parties thereto then disagree as to the continuance of any weekly payments, either party may make application to the Commission for a hearing in regard to the matters at issue and for a ruling thereon. Here, the appellant did make application to the Commission, under Section 72-170 of the Code, and in accordance with Rule 12 of the Commission, for permission to discontinue payment of com-

pensation to the claimant because he had refused to accept employment procured for him suitable to his capacity. We point out that there can be no discontinuance of the weekly payments until such is approved by the Commission. When the single Commissioner refused to hear and determine this issue, because he asserted that he was without jurisdiction due to an appeal to the Circuit Court, it was the duty of the appellant to appeal from such ruling to the full Commission, as is provided in Section 72-355 of the 1952 Code of Laws. In the event of an adverse decision of the full Commission, the appellant could then appeal, pursuant to Section 72-356 of the Code, to the Circuit Court. This procedure was not followed by the appellant and we think such failure is fatal to our consideration of the question now asserted.

In the case of *Riddle v. Fairforest Finishing Co. et al.,* 198 S. C. 419, 18 S. E. (2d) 341, 344, it was said:

"Thus, it seems to us made plain, that the intention of the legislature was to provide for the disposition of a claim made to the Industrial Commission by the orderly process of a hearing before a single commissioner, or a deputy appointed by the full commission; a review, by the full commission, of the single commissioner's award; an appeal from an award by the full commission to the Court of Common Pleas; and an appeal from the Court of Common Pleas to the Supreme Court." See Sections 72-355 and 72-356 of the 1952 Code of Laws.

Here, the appellant did not follow the statutory procedure of appealing from the ruling of the single Commissioner to the full Commission. In order to give the Circuit Court jurisdiction to hear the matter at issue, it was necessary for the appellant to appeal from the single Commissioner to the full Commission and then to the Court of Common Pleas, and from the order of the Circuit Court to this Court. Since the appellant has not followed the appeal procedure outlined, the question posed here is not properly before us for decision.

The exceptions of the appellant are overruled and the judgment of the lower Court is affirmed.

TAYLOR, C. J., and LEGGE and LEWIS, JJ., concur.

OXNER, J., dissents.

OXNER, Justice (dissenting).

I think the majority opinion has extended the doctrine of unusual strain or exertion as a basis for compensation in heart cases to an extent not warranted by any previous decision of this Court, and has set a precedent which may seriously handicap those having heart ailments in obtaining employment and which may tend to discourage employers from continuing in their service those so afflicted.

As pointed out in *Kearse v. South Carolina Wildlife Resources Department,* 236 S. C. 540, 115 S. E. (2d) 183, 186, "if a heart attack results as a consequence of the ordinary exertion that is required in the performance of the duties of the employment in the ordinary and usual manner, and without any outward untoward event, it is not compensable as an accident." And, further, "the fact that due to a weakened heart condition the exertion required for the ordinary performance of the work is too great for the particular employee who undertakes to perform it, does not make it a compensable accident."

I fail to find in this record any evidence showing that claimant's heart attack was induced by any unexpected strain or over-exertion in the performance of the duties of his employment or by any unusual or extraordinary conditions in the employment. Evidently Commissioner Reid reached the same conclusion, for he dissented from the finding of the majority of the Commission.

The situation is simply this: Claimant's duties consisted mainly of filling orders for samples of various fabrics and involved sewing and cutting the samples, lifting and carrying rolls of fabrics from their storage place to his work area, as well as displaying samples. He went to work at 7:00

o'clock, the usual time. For about an hour he performed his normal duties, during which time he handled five or six rolls of cloth. The work day which he had planned was then interrupted by a visit of some officials of the mill who requested him to exhibit various fabrics. Claimant then carried rolls of fabric back and forth so that the officials might examine them. This was not unusual as it was done several times a week. They remained in the room about two hours. The work required of claimant during this period entailed no unusual exertion. While he says that he then had to carry the rolls of fabric a longer distance than he did during his regular work, he made no contention that this made his duties more strenuous. In fact, he frankly states that the rolls lifted during that time were "mostly lighter and smaller" than those ordinarily handled. Around 10:00 o'clock these officials left, at which time claimant says he went back to "this heavy work that I had been doing." During the next hour he lifted about eight or ten rolls of cloth and performed other duties pertaining to his employment. About 11:00 o'clock he said he became "weak" and "felt terrible." He continued on the job, however, until quitting time at 3:00 o'clock that afternoon.

The testimony quoted in the majority opinion clearly discloses that the only unusual conditions pointed out by claimant as occurring on the day in question was that his planned day was interrupted and "broken up", which worried him. He said as a result he tried to "double up" in order to complete the work he had planned for that day but there is no contention that any superior officer required him to hurry or double up. In fact, any rush could not have lasted over an hour because he claims his heart attack occurred about 11:00 o'clock.

A somewhat similar claim of overexertion and strain was made in *Radcliffe v. Southern Aviation School*, 209 S. C. 411, 40 S. E. (2d) 626. There the employee, who worked as a guard, claimed that a stroke of paralysis suffered during his employment was induced by the fact that his work

was "doubled up" and he became excited. The Court held that although due to a shortage of help the guards were required to do extra work, there was no evidence of unusual strain or exertion.

The facts are quite different from those in the recent cases of *Kearse v. South Carolina Wildlife Resources Department,* 236 S. C. 540, 115 S. E. (2d) 183, and *Wynn v. Peoples Natural Gas Co. of South Carolina,* S. C., 118 S. E. (2d) 812. In the *Kearse case* it was held that a cerebral thrombosis suffered by an employee constituted a compensable accident. The evidence showed that for several days prior to the attack, claimant worked sixteen to eighteen hours a day as a game warden, far in excess of his usual hours of work, and during that period underwent extreme physical exertion in dragging boats and pushing an automobile over rough terrain. In the *Wynn case* it was held that a heart attack suffered by a general manager and supervisor of the operations of a gas company constituted a compensable accident. The evidence showed that while his ordinary work day was about eight and a half hours, prior to the attack he was required during a period of conversion from propane to natural gas to work sixteen hours per day in order to perform the extra duty of supervising the conversion work. We have no such evidence of unusual strain or exertion here.

Nor do I find any evidence that the alleged unusual strain induced a heart attack. The Industrial Commission found as a fact that claimant had a "preexisting heart disease." This much is apparently conceded by respondent's counsel in his brief. His position seems to be that claimant's preexisting heart condition was aggravated by the work which he did on December 29, 1958. The only medical evidence offered by him to show a causal connection was the testimony of Dr. D. J. Turrell, an internist at the Fort Jackson Hospital in Columbia, to whom claimant was sent by his family physician on December 30th. The following is taken from the testimony of Dr. Turrell on direct examination:

"Q. Based upon the history that has been given to you, do you have any opinion as to whether or not this man's work on the particular day in the manner that he described to you contributed to or aggravated his condition? A. I'd like to give a fairly long answer if I may.

"Q. Yes, sir. A. His story that he gave me originally was that, and I'm not clear as to the exact day—either Thursday or Friday or Saturday—probably Friday, he went on a hunting trip and for the first time, while exerting himself, experienced severe chest pain and some shortness of breath. This pain then recurred in subsequent days up until the event we are discussing on several occasions again with exertion. This was quite severe and caused him to rest. In fact, on Sunday I believe, he spent a lot of time at home resting. He did not realize what this pain meant and went to work on Monday and then subsequently had more pain, and then awakened—went home that afternoon after work, went back to bed and rested again, and then awoke, I gather, about midnight or one a. m. with severe pain in his chest. His friend, Dr. Buchanan, I believe, was called and saw him at some time thereafter and sent him to the hospital as a suspected heart attack, at which point I first saw him.

"Under those circumstances, there is now becoming recognized among medical authorities a clinical entity or syndrome known as an impending heart attack that is, somebody who's threatening to have one; and this is characterized by either a person who has had heart disease suddenly developing more chest pain with the usual amount of work being done, or in a person who is not previously known to have heart disease developing severe chest pain quite repetively on what he normally would do—his normal activity. When a person like this is seen the doctor tends to suspect that perhaps a heart attack is impending, that is, may occur. Now, some people, of course, who develop heart pain, or angina pectoris, develop it slowly over a period of time, it doesn't come on suddenly; usually it's first seen with very great effort. However, in these cases I am discussing the

pain comes on with a lot of severity and quite frequently all at once. Under these circumstances the doctor doesn't know what is going to happen next.

"Now, it has been my practice, and it's been the practice of some authors I can quote if you wish, to take people like this and hospitalize them when they come into the office asking what the matter is, and study them; and if you get the impression that this is an impending heart attack situation, to actually treat them as though they are having a heart attack. I believe that the person in question (claimant) probably fits this category, and if he had walked into my office Monday morning instead of going to work I would have hospitalized him at that time and would not have let him go to work.

"Q. Well, with that history that you quoted, do you think that his going to work and doing this particular work as described, lifting, had any effects upon his having this particular attack—this pain and all that particular day? A. Well, as I said, I think that most probably it tended to aggravate what was going on; if I could have been on the scene and told him what was happening to himself, I would have stopped him.

"Q. Yes, sir; but you say it most probably aggravated what was already going on prior to going to work that day, based on his history? A. Uh-huh, I would think so."

Dr. Turrell was claimant's witness and he is bound by his testimony. It is quite obvious from what he said that it was extremely hazardous for claimant to go to work on the morning in question or to engage in any other physical activity. It is wholly conjectural whether his alleged heart attack of December 29th was precipitated by the worry and "doubling up" which he claims resulted from the visit of the mill officials.

The situation here is quite similar in many respects to that which prevailed in *Price v. B. F. Shaw Co.,* 224 S. C. 89, 77 S. E. (2d) 491, 496. There the employee suffered

from heart disease and, in fact, displayed symptoms of heart trouble on the morning before he went to work. However, he went on the job and about an hour later suffered a fatal heart attack. It was the opinion of several physicians that the work in which he was engaged on the morning of his death accelerated and contributed to his death. In denying compensation, the Court said: "The medical testimony is definitely to the effect that the deceased should have remained in bed on that morning and any physical exertion at all was hazardous and might have precipitated the attack. While the medical testimony warrants the inference that if the deceased had stayed in bed, he might have lived longer, yet he chose not to stay in bed, and it is therefore wholly conjectural whether the heart attack which resulted in his death was precipitated or accelerated by the work, or the exertion incident to getting out of bed, dressing and going to work."

In further support of the views herein expressed, see *Sims v. South Carolina State Commission of Forestry*, 235 S. C. 1, 109 S. E. (2d) 701; *West v. City of Spartanburg*, 236 S. C. 553, 115 S. E. (2d) 295.

As I do not think the claimant suffered an injury by accident within the meaning of Section 72-14 of the 1952 Code, I would reverse the judgment of the Court below.