18331

Mrs. Johnnie R. LORICK, Respondent, v. SOUTH CAROLINA ELECTRIC & GAS COMPANY, Appellant

(141 S. E. (2d) 662)

514

*Messrs. Cooper, Gary, Nexsen & Pruet* and *Harold W. Jacobs,* of Columbia, *for Appellant,*

516

*Messrs. H. V. Sandifer,* of Lexington, and *Sidney Duncan,* of Columbia, and *George Bell Timmerman, Jr.,* of Lexington, *Counsel on Brief, for Respondent,*

April 13, 1965.

Moss, Justice.

This case arose under the South Carolina Workmen's Compensation Act, Section 72-1 et seq., Code of 1962. It involves a claim for compensation arising out of the death of Johnnie R. Lorick, who left surviving him his dependent widow, the respondent herein. She alleges that Johnnie R. Lorick, who was employed by South Carolina Electric & Gas Company, the appellant herein, as a bus driver, died on July 29, 1963, from a coronary occlusion. She contends that such was an accident arising out of and in the course of his employment as aforesaid, and that his death was caused by unusual strain and overexertion in the performance of the duties of his employment and, therefore, was a compensable accident. The appellant denied that the death of Johnnie R. Lorick arose out of and in the course of his employment, contending that his death was a result of natural causes.

A hearing was held before a Single Commissioner on December 30, 1963. This Commissioner, on February 14, 1964, filed his award wherein he found that Johnnie R. Lorick died on July 29, 1963, as a result of a coronary occlusion, and "such was precipitated by excessive and unexpected strain, stress and tension in the performance of his duties, thereby constituting a compensable accident." The appellant made timely application for a review of this award to the Full Commission, and by appropriate exceptions challenged the correctness of the findings of fact made by the Single Commissioner. The Commission, by a three to two majority, affirmed the award made by the Single Commissioner. Thereafter, an appeal was duly taken by the appellant to the Court of Common Pleas for Richland County and was heard by the Honorable John Grimball, Resident Judge, who, on June 9, 1964, issued his order affirming the decision and award of the Commission. Timely appeal to this Court followed.

The basic question for decision here is whether there was any evidence to support the findings of the Commission that the coronary occlusion suffered by the deceased was a compensable accident within the meaning of the Workmen's Compensation Act. It is the contention of the appellant that the deceased, at the time of his heart attack, was engaged in his usual work and was not subjected to any unusual or unexpected strain or overexertion in the performance of the duties of his employment or by any unusual or extraordinary conditions thereof. Hence, it is the contention of the appellant that there was no causal connection between the employment of the deceased and his heart attack. The respondent contends to the contrary.

We have held in numerous cases and it is now well established that a claimant, who asserts the right to compensation, must establish by the preponderance of the evidence the facts which will entitle her to an award under the Workmen's Compensation Act, and such award must not be based on surmise, conjecture or speculation.

*Glover v. Columbia Hospital,* 236 S. C. 410, 114 S. E. (2d) 565, and *Fowler v. Abbott Motor Co.,* 236 S. C. 226, 113 S. E. (2d) 737. Likewise, it is well settled that in workmen's compensation cases the Commission is the fact finding body and that on appeal, this Court and the Circuit Court are limited in their review of the facts to a determination of whether or not there is any competent evidence to support the factual findings of the Commission. When there is a conflict in the evidence, the findings of fact of the Commission are conclusive. It is only when the evidence gives rise to but one reasonable inference that the question becomes one of law for the Court to decide. *Black v. Barnwell County,* 243 S. C. 531, 134 S. E. (2d) 753.

The mere fact of death during employment is not a basis for an award. The death must be proximately caused by an accident that arose out of the employment; and the burden is on the claimant to establish such fact. *Rivers v. V. P. Loftis Co.,* 214 S. C. 162, 51 S. E. (2d) 510. Since it is conceded that the deceased was about the duties of his employment when he suffered the fatal coronary occlusion, the burden was upon the respondent to show by a preponderance of the evidence a causal connection between the employment and the heart attack.

The testimony shows that the deceased had been employed by the appellant at a bus driver in the City of Columbia from November 1, 1942 until his death on July 29, 1963. On October 8, 1951, he suffered a coronary occlusion, as a result of which he was disabled for approximately six months. At the time of this attack he was driving the Camp Fornance-Rose Hill run, the daily shift which was 9 hours and 30 minutes, and involved driving 100 miles. After returning to work he requested and was assigned to the Edgwood run, which required a daily shift of 9 hours of driving and covered 93.7 miles. After this, on March 27, 1960, he requested and was transferred to the Melrose Heights run, where he operated until his death, which was 87.7 miles in length and

required 8 hours and 40 minutes per day of driving. He drove six days per week on all of these shifts.

The decedent reported to work on July 29, 1963, at 3:25 P. M. and was assigned his regular bus No. 210, which was a forty-five passenger GMC 1963 model, and was the newest model of buses operated by the appellant. The end of the Melrose Heights run was at the corner of Woodrow Street and Millwood Avenue. It was at this place that the decedent would have a three to five minutes break before starting back to the city and normally he ate his lunch during this break.

Elnora Robinson, a witness for the respondent, testified that she lived on Laurel Street which is on the western side of the City of Columbia, but that she worked at 2709 Gervais Street. She boarded the bus driven by the decedent at 7:40 P. M. for the purpose of riding from her place of employment to her home. At the time she boarded the bus there were no other passengers thereon nor did the bus pick up any others before reaching the corner of Woodrow Street and Millwood Avenue, a distance of approximately two miles. There the bus stopped for a short period of time and the decedent, as was his custom, left the bus with his lunch but reboarded almost immediately without eating it. This witness testified that she had been a regular passenger on the bus ever since the decedent had taken over the run and knew him well. She testified that the decedent talked to her all the time when she got on the bus but on this evening he was quiet and didn't say a word to her and she thought this was unusual. She said that after the decedent reboarded the bus he proceeded down Millwood Avenue towards Gervais Street, driving at a considerably slower speed than was his normal custom. She was asked what, if anything, happened after the bus had come down Millwood Avenue and got almost to Gervais Street. We quote the following from the testimony:

"Q. And what, if anything, happened before he had an accident?

"A. Well, he was going down Millwood. Just then I saw some boys come out into the street—I don't know whether they came out in the street but when I looked up they was going back.

"Q. What made you look up, Elnora?

"A. Well, he must have applied his brakes and caused a sharp swerve.

"Q. Did you feel the bus swerve and slow up or something?

"A. Well, yes sir, I did.

"Q. And that brought your attention to look up?

"A. To look up to see what was going on and just then I saw some boys going back out of the street. I don't know whether they had crossed or what but when I saw them they was going back, returning."

This witness testified that after the bus swerved that she could tell that the bus driver had his feet on the brakes because something was stopping the bus. She said that a few moments later and prior to the time the bus hit the power pole on the right of the street that the bus driver was look-up and she "thought he was looking in the mirror" of the bus. She testified that after the bus struck the power pole, the decedent was slumped over the steering wheel.

The record shows that Willis Haymon boarded the bus at the corner of House Street and Millwood Avenue. He said that when the bus got near Powell's garage at the intersection of Millwood and Gervais that "I was looking out and some children started out in front of the bus so he swerved it to the left and then hit the brakes and after a while he did like this here and kept rocking and then he ran into the pole and then he fell over after he hit the pole." This witness, describing the actions of the decedent, said "He swerved and switched a little bit and then hit the brakes," and "then about from here to the window he went into the pole."

W. E. Dorn, a bus driver with twenty-one years experience, testified that once a week he drove the same bus over

the same route as did the decedent. He was asked as to some of the problems encountered in driving a bus on this run. His reply was "Well, you got bicycles to watch, kids on skates, balls rolling in the street, people walking in front of you dodging cars, but that's just in a days work." We quote the following from his testimony:

"Q. Is that normal routine work?

"A. That's right.

"Q. Is it unusual for you to have to dodge pedestrians by swerving and applying brakes?

"A. No, sir.

"Q. What's involved in turning this bus in the way of effort?

"A. Well, it's just about like driving an automobile.

"Q. Is this power steering?

"A. No, sir.

"Q. Is power steering needed?

"A. Sir?

"Q. Is power steering needed?

"A. No, sir.

"Q. When you're underway and you want to move over a lane or swerve, about what's involved in doing that?

"A. Oh, just the weight of your hand.

"Q. The weight of your hand? You don't have to grip the wheel?

"A. That's right.

"Q. It it a well balanced wheel and you can turn it with no problem?

"A. That's correct.

"Q. What about in stopping the bus and applying brakes?

"A. Well, your brakes is very easy. It's about like mashing the accelerator.

"Q. What kind of brakes do you have?

"A. Air brakes.

"Q. Air brakes?

"A. Yes, sir.

"Q. And these are easy to apply and give you a rapid stop?

"A. Very easy."

He further testified:

"Q. How many times a day do you have to cut your bus sharply to keep from running over a kid?

"A. Well, I couldn't say exact. I've never counted or nothing like that, but it'll average out two or three times a day.

"Q. Two or three times a day?

"A. Yes, sir. Either a kid, or hitting a bicycle or hitting automobiles or people walking—first one thing and another.

"Q. That's an everday occurrence?

"A. Oh, yes.

"Q. It doesn't upset you at all?

"A. No, sir."

Calvin Feaster, a bus driver with the appellant since 1952, testified that he succeeded the decedent on the Melrose Heights run and was operating bus No. 210. He said there was no more physical effort involved in swerving this bus than in operating an ordinary automobile. He further testified that there was nothing unusual in having to avoid children or pedestrians while operating this bus and such constituted a normal part of the bus driver's routine.

Marion Hill testified that he had been employed by the appellant as a bus driver for twenty-three years and had operated the same type of bus that is here involved. He agreed with Dorn and Feaster as to the effort involved in turning and swerving such a bus and in the application of the air brakes. He further testified that there was nothing unusual, in the operation of a bus, in having to swerve such to avoid pedestrians, cars and animals.

Dr. C. Warren Irvin testified in behalf of the respondent. He said that he did not know the decedent nor had he ever treated him and was appearing as an expert witness. He said that where a person has an acute coronary occlusion, death usually occurs within an hour or within twenty-four hours

and sometimes it may take several weeks. He then expressed the opinion that when a person dies very suddenly that such is not necessarily a coronary occlusion but is known as a rhythm death. In answer to the question of whether a sudden shock or exertion could cause a heart attack, this witness said:

"It is felt by most people that if there is sufficient stress, either physical or emotional, that it can bring on a coronary occlusion or can bring on death from this rhythm disorder that I've already discussed. It is my personal opinion that it takes a considerable amount of physical effort to bring on a coronary occlusion, way exceeding the normal amount which a person normally does. I think there may be—it is much more difficult to evaluate emotional or psychological shock than it is to evaluate physical shock. People do suddenly die from severe emotional strain and stress and it's hard to evaluate, but I'm confident that they do on occasion."

This witness further testified that it was "unwise for any individual to perform extremely severe exertion to which he's not accustomed to. And I emphasize extremely because I think it has to be more than just some moderate physical exertion we're talking about."

In response to the question of what part does shock play in the heart condition, the response was:

"I think shock can play a more important part in some heart cases, particularly those in which the patient suddenly dies. This is this rhythm disorder. Although it is quite well known that a large percentage of people with heart attacks, will suddenly die, it does not have to be any shock involved. They just drop dead. This, unfortunately, is what happens to many people, but I'm confident in a certain number of cases, this dropping dead is triggered off by some sudden emotional shock or stress or however you want to put it. I've had that happen, unfortunately, not very frequently, I'm grateful, but it's not so rare that I think you can say that it's fortuitous when people with a sudden severe emotional shock such as you're told that a husband has dropped

dead, then I've had someone else in the family suddenly die from such an emotional shock."

Dr. Frank C. Owens testified in behalf of the appellant. He was called to the Columbia Hospital on the evening of July 29, 1963, and saw the decedent in the emergency room. Dr. Kirby Shealy, the family physician of the decedent, was also present. They concluded that death was caused by a coronary occlusion. Dr. Owens was completely familiar with the decedent's heart condition. He had examined him on several occasions. We quote the following from Dr. Owens' testimony:

"Q. Dr. Owens, in your opinion, is there any causal relationship between his driving the bus or possibly swerving to miss the children or applying brakes and his coronary?

"A. We had the information, of course, as to the condition of his heart over a period of years and he had not had any symptoms of his heart condition. By symptoms, I mean such as shortness of breath and pain around his chest, pain in his heart and the description given me at the time and some that I've heard here this morning—but the description given me at the time I felt that the bus driving part of it had nothing to do with the cause of his death. It was due to a coronary occlusion that came on suddenly and may have come on while he stopped to eat his lunch or any other time."

The general legal principles which govern the determination here of whether the employee's heart attack constituted a compensable accident within the meaning of the Workmen's Compensation Act, as established by our prior decisions, were re-stated in the recent case of *Black v. Barnwell County*, 243 S. C. 531, 134 S. E. (2d) 753, from which we quote:

"The general rule has been adopted in this State that a coronary attack suffered by an employee constitutes a compensable accident within the meaning of the Workmen's Compensation Act if it is induced by unexpected strain or overexertion in the performance of the duties of his employment, or by unusual and the extraordinary conditions in

the employment. *Kearse v. South Carolina Wildlife Resources Department,* 236 S. C. 540, 115 S. E. (2d) 183. It has also been held, as stated in *Walsh v. United States Rubber Co.,* 238 S. C. 411, 120 S. E. (2d) 685, that 'if a heart attack results as a consequence of the ordinary exertion that is required in the performance of the duties of the employment in the ordinary and usual manner, and without any outward untoward event, it is not compensable as an accident. The fact that due to weakened heart condition, the exertion required for the ordinary performance of the work is too great for the particular employee, who undertakes to perform it, does not make it a compensable accident. *Sims v. South Carolina State Commission of Forestry,* 235 S. C. 1, 109 S. E. (2d) 701.' "

The rule has been established in this State that "when the testimony of medical experts is relied upon to establish causal connection between an accident and subsequent disability or death, in order to establish such, the opinion of the experts must be at least that the disability or death 'most probably' resulted from the accidental injury." *Cross v. Concrete Materials,* 236 S. C. 440, 114 S. E. (2d) 828, and *Grice v. Dickerson, Inc.,* 241 S. C. 225, 127 S. E. (2d) 722.

A careful analysis of the testimony of Dr. C. Warren Irvin, a witness for the respondent, fails to show that the decedent's death, as a result of a coronary occlusion, was "most probably" induced by unexpected strain or overexertion in the performance of the duties of his employment, or by unusual and extraordinary conditions thereof. The burden was upon the respondent to establish a causal connection between the decedent's employment and his fatal coronary attack and since the evidence given by her own medical witness did not show that the employment "most probably" contributed to and precipitated the coronary occlusion, and the evidence given by the employer's medical witness shows that the "bus driving part of it had nothing to do with the cause of his death", the respondent

failed to carry the burden of proof. Nowhere in the testimony of the respondent's medical witness is there any support for a finding that the exertion of the decedent in making a sharp swerve or turn of the bus caused a coronary occlusion. He did testify, however, that nothing short of extreme physical exertion to which a patient was not accustomed could conceivably bring about an attack. What is or is not a precipitating factor when one suffers a coronary occlusion is, we think, a medical question.

In *Anderson v. Campbell Tile Co.*, 202 S. C. 54, 24 S. E. (2d) 104, we said:

"* * * where the subject is one for experts or skilled witnesses alone and concerns a matter of science or specialized art or other matters of which a layman can have no knowledge, the unanimous opinion of medical experts on particular subjects may be conclusive, even if contradicted by lay witnesses * * *." The foregoing was quoted with approval in *Dennis v. Williams Furniture Corp.*, 243 S. C. 53, 132 S. E. (2d) 1.

Larson in his treatise on Workmen's Compensation Law, Vol. II, Section 79.54, page 304, asserts that reliance on lay testimony is not justified when the medical question is a complicated one and likely to carry the fact finding body into realms which are more properly within the province of medical experts. We quote therefrom the following:

"The increasing tendency to accept awards unsupported by medical testimony should not be allowed to obscure the basic necessity of establishing medical causation by expert testimony in all but simple and routine cases—and even in these cases such evidence is highly desirable and is a part of any well prepared presentation." *Wynn v. Peoples Natural Gas Co.*, 238 S. C. 1, 118 S. E. (2d) 812, and *Dennis v. Williams Furniture Corp.*, 243 S. C. 53, 132 S. E. (2d) 1.

In the following cases there was medical testimony that there was causal connection between the work performed by the decedent and the heart condition which caused his

death. *Westbury v. Heslep & Thomasson Co.*, 199 S. C. 124, 18 S. E. (2d) 668; *Green v. City of Bennettsville,* 197 S. C. 313, 15 S. E. (2d) 334; *Raley v. City of Camden,* 222 S. C. 303, 72 S. E. (2d) 572; *Ricker v. Village Management Corporation,* 231 S. C. 47, 97 S. E. (2d) 83; *Kearse v. S. C. Wildlife Resources Department,* 236 S. C. 540, 115 S. E. (2d) 183; *Walsh v. U. S. Rubber Co.,* 238 S. C. 411, 120 S. E. (2d) 685. In the following cases, where the medical evidence fails to show a causal connection between the work performed by the decedent and the heart condition which caused his death, compensation was denied. *Rivers v. V. P. Loftis Co.,* 214 S. C. 162, 51 S. E. (2d) 510; *Price v. B. F. Shaw Co.,* 224 S. C. 89, 77 S. E. (2d) 491.

It is our conclusion that the medical testimony here ■ falls far short of that required to prove causation. The Commission could not make a determination of causal connection between an accident and death by coronary occulsion independent of supporting medical testimony where the assessment of the precipitating cause requires expert knowledge, such as here.

The respondent contends that disregarding the expert medical evidence the other testimony is sufficient to sustain the finding of causal connection. Reliance is had for this proposition upon the case of *Grice v. Dickerson, Inc.,* 241 S. C. 225, 127 S. E. (2d) 722. In the cited case the claimant suffered an injury which resulted in a hernia. After surgery for the repair of such, the claimant became totally disabled from rheumatoid arthritis and filed a claim for benefits for such disability. Liability was denied on the ground that there was no causal connection between the disability and the injury sustained. The Circuit Court reversed the holding of the Commission that causal connection did exist and an appeal to this Court followed. In reversing such holding we pointed out that the medical testimony clearly recognized the fact that either the traumatic injury sustained by the claimant or subsequent surgery for the repair of his resulting hernia could have been a precipitating factor in the

onset of rheumatoid arthritis. We further said that where the testimony of medical experts is not solely relied upon to establish causal connection, whether the presence or absence of such medical testimony is conclusive depends upon the particular facts and circumstances of the case. In the *Grice case,* We said:

"* * * The medical testimony was not relied upon to show causal connection, but to show that, from the other facts and circumstances, a conclusion of causal connection did not involve entry into the field of conjecture, surmise and speculation. The Commission was faced with the duty to chose among two or more causative factors. The uncertainty of the medical testimony was sufficiently supplied by the sequence of events which followed the injury."

The testimony of the two passengers who were on the bus at the time the decedent had his heart seizure was to the effect that he swerved the bus, applied his brakes and then went into a pole. The only evidence before the Commission was that the decedent had been driving a bus, as had been his normal custom, for approximately twenty-one years, and the swerve he made was the ordinary maneuver which bus drivers perform on the average of two or three times a day and required very little physical effort. The swerving of the bus to avoid people and objects in the street was a usual and ordinary incident of a bus driver's employment. In the lay testimony we find no evidentiary support of causal relationship between the employment of the decedent and his subsequent death as a result of a coronary occulsion. *Cross v. Concrete Materials,* 236 S. C. 440, 114 S. E. (2d) 828; *Dennis v. Williams Furniture Corporation,* 243 S. C. 53, 132 S. E. (2d) 1.

We conclude that there is no evidence to support the finding of the Commission that the decedent's death as a result of a coronary occlusion was precipitated by excessive and unexpected strain, stress and tension in the performance of his duties but, on the contrary, his heart attack took

place while he was engaged in the performance of the duties of his employment in the ordinary and usual manner.

The judgment appealed from is reversed and this case remanded for entry of judgment in favor of the appellant.

TAYLOR, C. J., LEWIS AND BUSSEY, JJ., AND LIONEL K. LEGGE, Acting J., concur.