17752

Irvin J. WYNN, Claimant-Respondent, v. PEOPLES NATURAL GAS
COMPANY OF S. C. and Pennsylvania Threshermen and Farmers
Mutual Casualty Company, Defendants-Appellants, and United
States Fidelity & Guaranty Company, Defendant-Respondent.

(118 S. E. (2d) 812)

2

*Messrs. Leatherwood, Walker, Todd & Mann,* of Green-ville, *for Appellants,*

*Messrs. George D. Levy* and *C. M. Edmunds,* of Sumter, *for Claimant-Respondent,*

*Messrs. Weinberg & Weinburg,* of Sumter, *for Defend-ant-Respondent,*

*Messrs. Leatherwood, Walker, Todd & Mann,* of Green-ville, *for Appellants, in Reply,*

4

March 13, 1961.

LEGGE, Justice.

In this workmen's compensation case the appeal presents four questions:

1. Was there evidence to support the finding by the Industrial Commission that the respondent, Wynn, was injured by accident arising out of and in the course of his employment?

2. If so, was there evidence to support the finding of total disability?

3. Was the exclusion of certain testimony error?

4. If respondent Wynn is entitled to compensation, should it be paid by one or by both of two insurance carriers; and if by both, how should it be apportioned between them?

Prior to January 31, 1958, there existed three corporations: (a) Sumter Gas and Power Co., which furnished both propane and natural gas service to the citizens of Sumter, S. C., (b) Peoples Gas Co., which furnished only propane gas service to the citizens of Darlington and Florence, S. C., and (c) a holding company that owned the stock of both of said corporations. Headquarters of the operations were located in Florence.

On January 31, 1958, the three corporations before mentioned were merged and became Peoples Natural Gas Co. of S. C. Its Darlington and Florence operations were insured, as to workmen's compensation, by the respondent United States Fidelity and Guaranty Co. (hereinafter referred to as U. S. F. & G). Its Sumter operations were insured, as to workmen's compensation, by the appellant Pennsylvania Threshermen and Farmers Mutual Casualty Insurance Co. (hereinafter referred to as P. T. & F.). Another corporation,

Supertane Gas Co., a wholly owned subsidiary of Peoples Natural Gas Co. of S. C., was also created to handle the propane gas service in Sumter; its coverage as to workmen's compensation was with U. S. F. & G.

Upon the merger, respondent, who for the preceding five years had been general manager of Sumter Gas and Power Co.'s operations, became general manager and supervising officer of the Sumter operations of Peoples Natural Gas Co. of S. C. and of Supertane Gas Co. His annual salary was apportioned between the Sumter division of Peoples Natural Gas Co. of S. C. and Supertane.

In 1958, Peoples Natural Gas Co. of S. C. undertook the conversion of its Darlington and Florence divisions from propane to natural gas, a task for which preparations such as the assembling of data and the employment and training of extra workmen had been under way for over a year. Respondent, then fifty-seven, had had experience in this sort of work in other states prior to his employment by Sumter Gas and Power Co.; and Peoples Natural Gas Co. of S. C. assigned to him the job of supervising the conversion in Darlington and Florence, in addition to his duties in Sumter.

The actual work of conversion to natural gas began in Darlington on July 8, 1958; it was completed there in about a week and then moved on to Florence. Respondent, whose regular duties prior to July 8 had entailed eight and one-half working hours per day, was required thereafter to work sixteen hours per day in order to perform the extra duty of supervising the conversion work. According to his testimony his work schedule during the Florence operation up to July 29 was as follows: leaving his home in Sumter about 5:00 o'clock a. m., he would go first to the company's plant there; then to Florence, arriving at or shortly after 6:00 a. m., to assembly the fifteen workmen under his supervision and instruct them as to their specific duties for the day; from 7:00 a. m. to 3:00 p. m. he would be engaged in supervising their work; about 3:30 p. m. he would return to

Sumter to keep up with a heavy schedule of pipe-laying and other work then in progress; after looking into that work he would go to his Sumter office to catch up with his clerical work there; and he would usually get home at 9:30 p.m.

On July 29, 1958, about 3:00 p. m., while eating lunch at a hotel in Sumter, respondent felt a pain in his chest. He finished the day's work and went home about 6:15 p. m.; and that evening he and his wife kept a dinner engagement at the home of a friend about ten miles out of the city. Upon their return home about 9:30 p. m., his chest pain having become worse, they called his physician, Dr. Harritt, who tried to have him admitted to the hospital, but without success, as no room was available. Next morning he was admitted and examined and an electrocardiogram made, with negative result. On July 31 he was discharged from the hospital; and he worked on Friday, August 1, and Saturday, August 2. On Sunday, August 3, between 2:00 and 3:30 p. m., he suffered severe pain in the chest and arms, and was taken to the hospital, where an electrocardiogram revealed a myocardial infarct. He remained in the hospital for six weeks under the care of Drs. Harritt and White, and was then discharged to his home, where he remained in bed for two more weeks. He began a limited return to his work early in December; was coming in for half a day by the middle of December; and continued on a gradual basis until February 11, 1959, when his employment was terminated under circumstances to which we shall later refer. He was paid his full regular wage to March 16, 1959.

The evidence shows without contradiction that respondent had had no heart trouble prior to the attack that commenced on July 29, 1958. Dr. White testified that some degree of arteriosclerosis, apparent upon his examination of respondent, was not the cause of respondent's disability; that such disability was the result of the infarct, or thrombosis, which in the opinion of the witness was most probably precipitated by the unusual exertion, overwork and mental strain to which respondent had been subjected by having to perform, in ad-

dition to his regular work, the task of supervising the conversion of the Darlington and Florence areas from propane to natural gas. Dr. Harritt, also, testified to the effect that although in 1957 he had observed that respondent had some arteriosclerosis, such was not the cause of his present condition; and that the myocardial infarct, from which respondent's present condition resulted, was most probably brought about by the unusual exertion and strain of his duties incident to the conversion work before mentioned.

A thrombosis is a compensable "accident" if induced or precipitated by unexpected strain or over-exertion in the performance of the employee's duties or by unusual and extraordinary conditions in his employment. *Kearse v. South Carolina Wildlife Resources Dept.,* 236 S. C. 540, 115 S. E. (2d) 183. In the case at bar we think that the Commission's finding of compensability was adequately supported by respondent's testimony and that of Drs. White and Harritt before mentioned.

The Commission based its finding of total disability on the testimony of respondent and his two physicians, Drs. White and Harritt. The issue before us, whether this testimony afforded sufficient basis for such finding, is interwoven with appellants' exceptions charging error in restricting their counsel in the cross-examination of Dr. White and in the examination of Mr. Lucas, the President of Peoples Natural Gas Co. of S. C., as to the circumstances attending the termination of respondent's employment. We shall therefore discuss these questions together.

Respondent testified that although he returned to work on a limited basis, about an hour and a half each day, early in December, 1958, he was not able to do any work or to exert himself at all; that about the middle of December he had a backset and was told by Dr. Harritt to remain out until the first of the year; that his employment continued until February 11, 1959, at which time, upon the advice of Drs. Harritt and White, he handed in his resignation; that

since then he has done no work and has not attempted to do any, because Drs. Harritt and White have advised against it; and that he still suffers shortness of breath and is obliged to rest both in the morning and in the afternoon. The following is from his testimony on cross-examination:

"Q. But in fact were your services not terminated prior to sending in your resignation? A. Not that I know of. I gave ninety days notice and it was not acceptable and we quit, but my doctors had already advised me to get out of the company.

"Q. But you deny that you were actually fired? A. That depends on how you look at it."

Dr. White testified on direct examination, in response to counsel's inquiry as to respondent's physical condition at the time of his last examination by the witness, about two months prior to the hearing:

"A. I think he was able to do full time work, qualified by no heavy lifting.

"Q. What about mental strain or stress? A. I do not think he should be subjected to any mental strain or stress.

"Q. If his work required him to take care of manufacture, sales and complaints of the public, would you say he is able to perform fully these duties, without injury to himself? A. Yes, if he is not put under any excessive strain.

"Q. Excessive strain, either physical or mental? A. That is right."

In the course of the cross-examination of Dr. White the following transpired:

"Q. Can you say the strain of the work alone was the only strain that came into play in bringing about this condition? A. I could not say it was the only strain.

"Q. You can not tell from what sources strain might have arisen? A. He had no financial problems and no domestic problems to my knowledge.

"Q. But you are not prepared to say—A. I don't know what his bank account was, he and his wife were both work-

ing and he certainly showed no evidence of any financial strain."

At this point, respondent's counsel having objected to further pursuit of this line of inquiry, and appellants' counsel having insisted that he was entitled to know what sources of stress and strain, other than respondent's work, had been taken into consideration by the witness, the Hearing Commissioner stated: "He has no way of knowing what brought on the strain, and I think we should stop right there." Appellants' counsel then proceeded, without objection as follows:

"Q. Doctor, the only element you have taken into consideration was the stress and strain occasioned by the work? A. That is not the only element I took into consideration. That was self evident, and there was no other sources of physical or mental strain—no evidence of other sources."

The Commissioner's ruling, just quoted, to which appellants have taken exception, resulted in no prejudice to appellants' case. The witness had already testified that the strain of the work had contributed to the thrombosis and that, while he could not say that that was the only strain, there was no evidence that respondent was under any strain of either financial or domestic problems. And finally, after the ruling, he again stated that there was no evidence of any source of physical or mental strain other than the work itself.

Dr. Harritt testified, with regard to the extent of respondent's disability:

"Q. What is his present condition with respect to being able to perform any work? A. That is most difficult to evaluate in his condition. You have to take into consideration what type of work he might do in the future. I would say that he should not push himself and forego stress and strain and, as Dr. White said, he must not exert himself to any extent."

·  · Dr. C. Warren Irvin, Jr., a witness for the appellants, testified that at their counsel's request he had seen respondent on December 1, 1958, at which time he had given him a complete physical examination, including fluroscoping of heart and lungs and making a cardiogram; that he had also seen him shortly before the hearing; that from such examination and the history given by respondent, and from what the witness had learned as to the nature of respondent's work, it was his opinion that respondent's thrombosis had not been brought about by overwork; that respondent had made a satisfactory recovery; that his current symptoms of shortness of breath were not due to heart disease; and that in the opinion of the witness respondent was able to return to full time employment on a job similar to the one that he had held prior to the attack.

In the course of his direct examination of Mr. Lucas, President of Peoples Natural Gas Co. of S. C., appellant's counsel asked the witness to give "the details of the termination of Mr. Wynn's employment" with that company. Respondent's counsel having objected to the question as irrelevant, and the Commissioner having ruled that appellants' counsel would not be permitted to go into management or labor problems and would be limited to inquiry of the witness whether respondent resigned or was fired, the witness replied: "I cannot in truth do justice to either side by a yes or no answer, and I would like to be asked the question in such a way that I can answer and not hurt either side. My position in this matter is absolutely neutral." At this point the Commissioner sustained the objection, saying that since the witness had stated that he could not answer without going into all the details the inquiry could not be pursued further. Thereupon appellant's counsel asked the witness whether respondent's services had been terminated by the witness, or whether the witness had accepted respondent's resignation, to which the witness replied: "His resignation— I cannot answer that. If I may say so, this is a very difficult thing and I do not want to work a hardship on either part.

Mr. Wynn acted in a very mercurial manner when I came to the office that day and said some day he would give me ninety days notice and just walk out, and I said, 'Mr. Wynn, you have your ninety days right now.' ". Thereafter, on redirect examination, appellants' counsel stated: "I am not sure about the ruling. I would like to and propose to ask this question: Mr. Lucas, was Mr. Wynn's employment with Peoples Natural Gas Company terminated in any manner as a result of any physical disability?" To this the Commissioner replied: "Don't answer that. I have sustained the objection."

We think that the last question thus proposed was a ■ proper one, and that the Commissioner erred in declining to permit the witness to answer it. But in our opinion the error does not require reversal, because it is quite evident from Mr. Lucas' testimony to which we have before referred, and which was admitted without objection, that despite his reluctance to say so he considered that he had terminated respondent's employment because of his "mercurial manner" on the occasion of Mr. Lucas' visit, and not because of physical disability.

Disability in compensation cases is to be measured by ■■ loss of earning capacity. *Keeter v. Clifton Mfg. Co.,* 225 S. C. 389, 82 S. E. (2d) 520. Total disability does not require complete helplessness. Inability to perform common labor is total disability for one who is not qualified by training or experience for any other employment. *Colvin v. E. I. DuPont de Nemours Co.,* 227 S. C. 465, 88 S. E. (2d) 581. On the other hand the rule in most states is that an employee who is capable of performing other work that is continuously available to him will not be deemed totally disabled because he is unable to resume the duties of the particular occupation in which he was engaged at the time of his injury. *Clark v. Henry & Wright Mfg. Co.,* 1950, 136 Conn. 514, 72 A. (2d) 489; *Frennier's case,* 1945, 318 Mass. 635, 63 N. E. (2d) 461; *Stillwater Worsted Mills, Inc. v. Beal,* R. I. 1959, 150 A. (2d) 704; Larson's Work-

men's Compensation Law, Section 57.53. The generally accepted test of total disability is inability to perform services other than those that are "so limited in quality, dependability, or quantity that a- reasonably stable market for them does not exist." *Lee v. Minneapolis Street Ry. Co.,* 1950, 230 Minn. 315, 41 N. W. (2d) 433, 436; *Colvin v. E. I. DuPont de Nemours Co., supra;* Larson's Workmen's Compensation Law, Section 57.51.

We are not the triers of the facts in compensation cases; our review of a factual finding by the Commission is limited to determination of whether or not there is any competent evidence to sustain it. *Cross v. Concrete Materials,* 236 S. C. 440, 114 S. E. (2d) 828; *Halpern v. DeJay Stores, Inc.,* 236 S. C. 587, 115 S. E. (2d) 297. Regardless of conflict in the evidence, either of different witnesses or of the same witness, a finding of fact by the Commission is conclusive. *Glover v. Columbia Hospital of Richland County,* 236 S. C. 410, 114 S. E. (2d) 565. But an award may not rest on surmise, conjecture or speculation; it must be founded on evidence of sufficient substance to afford a reasonable basis for it. *Rivers v. V. P. Loftis Co.,* 214 S. C. 162, 51 S. E. (2d) 510; *Bagwell v. Ernest Burwell, Inc.,* 227 S. C. 444, 88 S. E. (2d) 611.

Tested by these principles, the finding of total disability here cannot stand. Respondent's testimony to the effect that since his recuperation in the fall of 1958 he has not been able to do any work is belied by the agreed statement in the transcript that he "began a limited return to his work about the middle of December, 1958, on an ever-increasing basis" and "on February 10, 1959, the claimant terminated or was terminated from his employment." It must be considered in connection with his testimony that it was upon the advice of his physicians, Drs. Harritt and White, that he quit his employment and sought none thereafter. It must be considered in the light of the fact that neither Dr. Harritt nor Dr. White corroborated or was asked to corroborate that statement, and that on the

contrary both of these physicians testified in substance that respondent is able to work if he will avoid undue physicial or mental strain. In the face of these facts, and of this testimony, respondent's bare statement that he is unable to work is insufficient, in our opinion, to afford reasonable basis for the conclusion that he is totally disabled. The question of the extent and probable duration of respondent's disability, if any, was not a simple one for the solution of which the Commission would be justified in accepting his testimony against that of the medical experts whom he himself had called as witnesses. Cf. *Hines v. Pacific Mills,* 214 S. C. 125, 51 S. E. (2d) 383. As Mr. Larson puts it: "* * * reliance on lay testimony and administrative *expertise* is not justified when the medical question is no longer an uncomplicated one and carries the fact-finders into realms which are properly within the province of medical experts * * *. The increasing tendency to accept awards unsupported by medical testimony should not be allowed to obscure the basic necessity of establishing medical causation by expert testimony in all but the simple and routine cases * * *". Larson's Workmen's Compensation Law, Section 79.54. The principle thus stated concerning testimony as to causation is equally applicable to testimony as to extent of disablement in cases such as the one at bar.

We find no error in the hearing Commissioner's ruling, affirmed by the full Commission and by the Circuit Court, that P. T. & F. should pay the award in full and that U. S. F. & G. is liable for no part of it. There was but one employer, Peoples Natural Gas Co. of S. C. It had two branches, to wit, the Florence-Darlington branch and the Sumter branch. It had two policies of compensation insurance, as follows: (1) a policy of U. S. F. & G. covering its employees in the Florence-Darlington branch, the premium on that policy being computed on the basis of the salaries and wages of those employees; and (2) a policy of P. T. & F., covering its employees in the Sumter branch, the premium on that policy being computed on the basis of their

salaries and wages, including the salary of respondent. Always an employee in the Sumter branch, respondent was detailed by the President of Peoples Natural Gas Co. of S. C. to supervise the conversion of customers' equipment in the Florence-Darlington area from propane to natural gas, his duties on that job being in addition to his regular duties as manager of the Sumter branch. His salary was not increased by virtue of this additional work; all of it was paid through the Sumter branch, none through the Florence-Darlington branch; no part of it was included in the computation of the premium on U. S. F. & G.'s policy. The mere fact that respondent's duties in supervising the work of conversion were performed outside of the Sumter area did not operate to remove him from the P. T. & F. coverage.

*Carter's Dependents v. Palmetto State Life Ins. Co.,* 209 S. C. 67, 38 S. E. (2d) 905, cited by appellants, is not in point. There the employer and its single carrier contended that the policy covered only elevator operators; and the issue was whether the deceased employee, who was not an elevator operator, was covered. We held that, since the employer had given notice of its election to come under the Workmen's Compensation Act, Code 1952, § 72-1 *et seq.,* and had filed with the Industrial Commission no notice to the contrary, it was operating under that Act; that the employee was therefore entitled to the protection of the Act because an employer may not accept its benefits as to some employees and not as to others; and that, as between the beneficiaries of the deceased employee and the carrier the latter was liable, regardless of equities that might exist in its favor against the employer. In the case at bar, coverage is not questioned; the issue now under discussion is as to which of two carriers must pay the award.

Liability may not be imposed upon U. S. F. & G. as compensation carrier of Supertane because that corporation, an entity distinct from Peoples Natural Gas Co. of S. C., had nothing whatsoever to do with the conversion work or with

the assignment of the respondent to supervise it, and was not a party to the proceeding.

Nor may U. S. F. & G., as the insurer of the employees in the Florence-Darlington branch, be held liable under the "lent employee" theory (see *Brownlee v. Charleston Motor Express Co.,* 189 S. C. 204, 200 S. E. 819; *DeBerry v. Coker Freight Lines,* 234 S. C. 304, 108 S. E. (2d) 114; Larson's Workmen's Compensation Law, Sections 48.00 *et seq.*), for here there was but one employer, Peoples Natural Gas Co. of S. C.

Reversed and remanded for further proceedings consistent with the views herein expressed.

TAYLOR, OXNER and MOSS, JJ., concur.