18576

Melton R. BUNDRICK, Appellant, v. POWELL'S GARAGE AND WRECKAGE SERVICE and American Insurance Company, Respondents.

(151 S. E. (2d) 437)

*Charles A. Davis, Esq.,* of West Columbia, *for Appellant,*

*Messrs. Turner, Padget, Graham & Laney,* of Columbia, *for Respondents,*

November 18, 1966.

LIONEL K. LEGGE, Acting Associate Justice.

In this proceeding under the Workmen's Compensation Law the parties have agreed that the claimant was paid medical and related expenses and temporary total disability compensation to which he was entitled; and we are here concerned only with the amount of compensation due him under Section 72-153 of the 1962 Code for partial loss of use of his right arm. The Hearing Commissioner awarded compensation for a fifty per cent permanent loss of use; a majority of the Full Commission affirmed; the Circuit Court held that there was no competent evidence to support an award for more than twenty per cent, and decreed that the Commission's award be amended accordingly. From that decree the claimant has appealed.

There was before the Hearing Commissioner the testimony of but three witnesses, the claimant himself and his physician, Dr. E. K. Fennell, and on the other side, Dr. David E. Holler, whose written report was admitted without objection. Following is a summary of the evidence pertinent to the claim here in question.

Mr. Bundrick: He had been employed by Powell's Garage as crane operator for eighteen years prior to the date of the accident, at which time his work was that of heavy duty foreman-operator in charge of wrecker service. At the time of the accident he was on top of the crane, repairing it, when he stepped on a loose pipe which caused him to fall to the ground, resulting in injury to his hip and right elbow. His work was concerned chiefly with the handling and removal of trucks and other large vehicles wrecked or disabled on the highway, and it involved lifting of heavy equipment such as chains and snatch blocks. As the result of the accident he can no longer satisfactorily perform that type of work, and consequently he left his employment at Powell's Garage and undertook to operate a service station. He testified further that he is going to give up the service station but it is apparent, from his direct examination, that this

decision has resulted not from the injury to the arm, but from the hip injury, which renders him unable to do the amount of standing and walking required in that sort of work. As to the arm injury, he testified that Dr. Fennell, whom he had employed to examine it, advised him that he had "a calcium deposit growing in my right elbow." And further: "* * * I did have, in my right arm, a nerve—I guess it was a nerve—it started to itchin' and burnin'. I went back to David Holler and he gave me some pills. He said it was a nerve in the arm; that at times it would do that; and I could—I couldn't feel it. It was just a burnin' sting kind'a inside the arm and anywhere you rubbed it you couldn't touch it. He gave me some pills and they eased it off awhile but when I notice that is when I—if strain the arm, the wrist swells up, and that's when I have the burnin' in the—on the nerve."

On cross examination, his testimony, relative to the arm injury, was as follows:

"Q. What is it, other than the lifting of this thing" (the hook that is used on the wrecker) "that you can't do with your job at Powell's?

"A. Well, I can't stay on my feet as much, and I just can't lift, and the work there calls for quite a bit of lifting. I was what you call 'heavy duty operator'; and if trucks turned over, well it was my job to go get 'em; and all that stuff that you use is pretty heavy.

"Q. How heavy would you say it is?

"A. Well, you got chains I guess weight fifty to sixty pounds. Snatch blocks weigh about the same. A truck laying on its side you got to rig from the wheel. You're over your head reaching. You got to rig that chain around the wheel and put the snatch block in.

"Q. You didn't ever lift all that stuff with just one arm anyway, did you?

"A. Lift it with both arms. You can't lift it with one.

"Q. Fifty to sixty pounds you couldn't lift it with one arm anyhow, could you?

"A. No, sir.

"Q. So you did use both arms?

"A. Yes, sir.

"Q. You can lift how much, would you say, with your right arm? How much weight?

"A. I probably lift—up over my head, I can't lift very much.

"Q. How about lifting off the ground—how much?

"A. I probably can carry twenty, twenty-five, thirty pounds with my right arm without hurtin' it.

"Q. So with both arms you can still lift these fifty to sixty pound chains or snatch blocks, couldn't you?

"A. No, sir, I couldn't—I couldn't do the rigging up over my head that was required, is the reason I asked for help.

\* \* \*

"Q. What sort of treatment, if any, was given you by Dr. Holler in connection with your hip?

"A. He x-rayed the hip. He said there's nothing that you could do for it. All he give me was pills for pain. That's about what he told me about my arm when I went back to, him with it hurtin'. He give me some pills for pain and said, 'Learn to live with it.' "

Dr. Fennell: First saw claimant on March 3, 1965, about five months after the accident. Claimant stated that in the accident he had fallen and hurt his elbow and leg, and had been treated by Dr. Holler, who had removed the radial head and had removed a lump from a puncture wound in the skin adjacent to the wrist. Claimant said that the wrist bothered him more than the elbow, especially following pulling, pushing or lifting with the hand, and that the wrist became swollen at times after use of it. Particularly complained of inability to use the hand with a twisting motion, as when using a screw-driver, and that he had difficulty even opening a door. "There was loss of motion of about twenty degrees flexion and fifteen degrees extension in the elbow, and I call that ten per cent permanent partial disability on the generally accepted figures in the AMA chart on im-

pairment. Further, the supination of the forearm was full; but pronation was decreased by about twenty degrees, so I rated that as three per cent permanent partial disability. Further, there was some enlargement about the wrist as compared to the other one. This was thought to be due to some synovial reaction in the wrist. Then, there was a loss of about ten degrees flexion, about ten degrees extension in the wrist, which would be another three per cent permanent partial disability to, the right upper extremity * * *. Subtotalling his permanent partial disability, I arrived at sixteen per cent permanent partial impairment of the right upper extremity. I x-rayed his elbow at the time and it showed, of course, the radial head had been removed, and there was a little density in the ligaments that looked like maybe a fragment of bone had been left there."

Dr. Fennell testified that he also saw the claimant on July 16, 1965, at which time claimant said that his arm was about the same, but he was complaining of some burning discomfort that he thought was a nerve moving up and down the forearm, from elbow to wrist, following supination and pronation. On that occasion Dr. Fennell took another x-ray of the elbow, which showed a little denser calcification in the ligaments about where the radical head had been removed. This second examination led Dr. Fennell to conclude that claimant's disability was a little higher than sixteen per cent, and that "twenty per cent permanent partial impairment of the upper extremity would be about right."

Dr. Holler's report, which was dated February 16, 1965, read as follows:

"Since this man's surgery for removal of radial head on November 16, 1964, he has recovered very nicely. His last visit to this office, on January 15, 1965, showed that he had a reasonably good range of motion lacking full extension. He was virtually without pain though with weakness of the arm which will last for some time. Some of this disability, of course, is permanent. Having reached a maximum of medical benefit he is being dismissed with a ten per cent permanent disability of his right upper extremity."

The Hearing Commissioner's finding of fact relative to the claim under Section 72-153 was as follows:

"5. That impairment ratings of the upper extremity have been given claimant by the medical witnesses. However, it is the decision of this Commissioner, based on the testimony submitted and observation, that the claimant has sustained a fifty per cent (50%) permanent loss of use of his right arm due to his inability to perform the work for which he was trained."

The hearing record contains no mention of observation or examination of the claimant by the Hearing Commissioner, except as follows:

1. The Commissioner directed the claimant to come forward for inspection as to disfigurement and thereupon noted that there was a scar in the region of the right elbow and a small scar on the hand, for which a disfigurement award of $150.00 was ordered.

2. The Commissioner asked the claimant if the injury to his hip affected his walk, or whether he walked normally. He replied: "As long as I'm going. When I give out, I can't go any further."

It will be seen from the foregoing that the Hearing Commissioner, disregarding all of the medical testimony, founded the award upon the testimony of the claimant alone and upon the Commissioner's "observation." As to the manner and extent of such "observation" with relation to impairment of use of the claimant's arm, there was no specific factual finding; so far as the record before us reveals, such "observation" was not even directed toward impairment of use of the arm.

On the other hand the circuit decree, with which this ▪▪▪ appeal is concerned, although conceding that the claimant's testimony had "probative value relating to the question of whether claimant's right arm was disabled at all", declared that such testimony had "no probative value in the determination of the extent to which it was disabled." It therefore rejected the claimant's testimony and held, in

effect, that the issue was to be determined upon the medical testimony alone. In our opinion this view was erroneous. Under the facts of this case, the issue of the extent of loss of use of the claimant's arm was not so technically complicated as to require for its determination medical testimony alone. We think, too, that the trial court, in undertaking to choose between the conflicting testimony of the two medical witnesses, impinged upon the fact-finding function of the Commissioner.

Unless the question of the extent of partial loss of use under Section 72-153 is so technically complicated as to require, exclusively, expert professional testimony, medical or other, cf. *Wynn v. Peoples Natural Gas Co.,* 238 S. C. 1, 118 S. E. (2d) 812, and *Dennis v. Williams Furniture Corporation,* 243 S. C. 53, 132 S. E. (2d) 1, lay testimony is of course admissible. Nor need the extent of such impairment of use be shown with mathematical exactness. *Dickey v. Springs Cotton Mills,* 209 S. C. 204, 39 S. E. (2d) 501; *Ripley v. Anderson Cotton Mills,* 209 S. C. 401, 40 S. E. (2d) 508. But the award may not rest on surmise, conjecture or speculation; it must be founded on evidence of sufficient substance to afford a reasonable basis for it. *Rivers v. V. P. Loftis Co.,* 214 S. C. 162, 51 S. E. (2d) 510; *Bagwell v. Ernest Burwell, Inc.,* 227 S. C. 444, 88 S. E. (2d) 611; *Wynn v. Peoples Natural Gas Co., supra.*

The judgment appealed from is reversed, and the cause is remanded to the lower court, to be by it remanded to the Commission for further proceedings consistent with the views here expressed.

Reversed and remanded.

Moss, C. J., and LEWIS, BUSSEY and BRAILSFORD, JJ., concur.