732 S.E.2d 190

Geneva WATSON, Appellant,

v.

XTRA MILE DRIVER TRAINING, INC., and Hartford Underwriters Insurance Co., Respondents.

No. 5013.

Court of Appeals of South Carolina.

Heard Jan. 26, 2012.

Decided Aug. 1, 2012.

Rehearing Denied Sept. 20, 2012.

456

Stephen J. Wukela, of Wukela Law Firm, of Florence, for Appellant.

Kathryn Rose Fiehrer, of Wood & Warder, LLC, of Charleston, for Respondents.

WILLIAMS, J.

In this workers' compensation appeal, Geneva Watson (Watson) challenges the Workers' Compensation Appellate Panel's (Appellate Panel) decision to admit into evidence the strength category portion of the functional capacity evaluation (FCE). Additionally, Watson asserts the Appellate Panel erred in failing to find her permanently and totally disabled. Watson also claims the Appellate Panel erred in granting her employer, XTRA Mile Driver Training, Inc., and its insurance company, Hartford Underwriters Insurance Company (collectively, XTRA), credit for all temporary disability compensation paid after the date of maximum medical improvement (MMI). We affirm.

## FACTS

On September 18, 2007, while working as Director of Placement for XTRA, Watson slipped on a golf ball and fell on her back. Watson was transported to Tuomey Emergency Room where the emergency room physician ordered lumbar and thoracic spine x-rays, which did not reveal any significant injury. A subsequent lumbar MRI of Watson's back revealed, in pertinent part, suspect hemangiomas, mild disc bulges, and spinal stenosis in Watson's back. The emergency room physician ordered Watson not to return to work for two days and instructed her to see a physician before returning to work.

On September 22, 2007, XTRA began paying Watson temporary total disability (TTD) compensation. Five months later, on February 12, 2008, XTRA and Watson executed a consent order wherein the parties stipulated to an average weekly wage of $485.71, with a resulting weekly compensation rate of $323.83.

In accordance with the emergency room physician's instructions, Watson went to XTRA's doctor, Dr. John Pate, and saw XTRA's nurse practitioner, Anita Curl. Ms. Curl ordered Watson not to return to work for one week and referred her to Pee Dee Orthopaedics. On October 1, 2008, Watson saw Dr. Rakesh Chokshi, an orthopaedic surgeon at Pee Dee Orthopaedics. Dr. Chokshi ordered epidural steroid injections, which did not significantly improve Watson's condition. Ultimately, Dr. Chokshi performed lumbar decompression surgery at Watson's L3–4 and L4–5 discs on March 31, 2009.

Dr. Chokshi then referred Watson to Tuomey Outpatient Rehabilitation Service for an FCE to establish her permanent work restrictions. The manager of outpatient rehabilitation at Tuomey Healthcare System, Jerry Shadbolt, performed the FCE on July 6, 2009. Shadbolt testified that during the FCE, he conducted a series of tests to measure Watson's ability to perform physical activities, such as sitting, walking, and standing.[1] Based on Watson's ability to perform physical activities,

---

1. The results of the tests revealed, in pertinent part: (1) Watson has a maximum lifting capacity of ten pounds, placing her into the light category for lifting capacity; and (2) Watson has a maximum carrying capacity of ten pounds, placing her in the light category for carrying capacity as defined by the Dictionary of Occupational Titles (DOT).

Shadbolt identified Watson's physical restrictions.[2] Shadbolt testified he entered Watson's physical restrictions and Watson's job title[3] into a computer, which utilized a software program to generate a report on Watson's strength and ability to return to work based on the DOT[4] guidelines. This report was listed in the strength category of the FCE and concluded:

> The Dictionary of Occupational Titles places Ms. Watson's occupation as a Director of Placement in the sedentary strength category. Therefore, Ms. Watson meets these strength requirements and may return to work as Director of Placement.

> Based on the strength classifications as established by the Dictionary of Occupational Titles, Ms. Watson is capable of assuming a position in the light strength category. Her maximum lifting capacity is 10 pounds, and her maximum carrying capacity is 10 pounds. According to the Dictionary of Occupational Titles, the light strength category is defined as having the ability to lift 10[to] 20 pounds and carry 5 to 10 pounds.

Shadbolt testified that his opinion as to whether Watson could return to work was not contained in the strength category of the FCE report. Shadbolt noted he is only an expert in conducting the tests to see how long Watson can perform physical tasks, and the computer generates the report based on the results of those tests.

However, Shadbolt testified he believed the strength category report's conclusion that Watson could return to light strength work was consistent with Watson's physical restrictions contained in the FCE.

---

**2.** Watson's job factor restrictions included: (1) no continuous standing for more than twelve minutes; (2) no continuous sitting for more than three minutes; (3) no continuous walking for more than 0.1 miles; (4) no pushing more than twenty pounds; (5) no pulling more than twenty pounds; (6) no stopping; and (7) no crawling on her hands and feet.

**3.** Watson selected her job title, Director of Placement, in the Dictionary of Occupational Titles, which established the strength category necessary to perform that occupation.

**4.** The DOT is a U.S. government publication that provides a description of occupational titles for most jobs in the United States and establishes a strength classification for each of these occupations. These strength classifications are sedentary, light, medium, heavy, and very heavy.

XTRA sent Watson a letter instructing her to return to work on Monday, September 28, 2009. Watson returned to work accompanied by her restrictions as listed in the FCE. Upon reviewing those restrictions, XTRA declined to offer her any work within the restrictions and sent her home.

At Watson's request, J. Adger Brown, a vocational analyst, reviewed Watson's FCE. Brown found the job factor restrictions provided by the FCE left Watson totally and permanently disabled and incapable of even sedentary employment.

**PROCEDURAL HISTORY**

On November 9, 2009, XTRA filed a Form 21 claiming Watson reached MMI on August 12, 2009.[5] Watson filed a Form 50, and XTRA timely responded by filing a Form 51.

At the hearing before the single commissioner, Watson alleged she was permanently and totally disabled and requested a lump sum payment of total disability benefits and lifetime causally-related medical treatment. XTRA claimed credit for overpayment of TTD paid after August 12, 2009, and sought a final determination concerning Watson's entitlement to future benefits.

Although Watson admitted the FCE into evidence before the single commissioner, she objected to the strength portion of the FCE generated by the computer, which used the DOT guidelines to conclude Watson was capable of assuming an employment position in the light strength category. The single commissioner overruled Watson's objection.

Taking into account the record as a whole, including Watson's testimony, the FCE, medical reports, the consent order, the depositions of Dr. Chokshi and Shadbolt, and the vocational assessment by Brown, the single commissioner found, in pertinent part: (1) Watson sustained an injury to her back as a result of the work-related accident; (2) XTRA provided Watson adequate medical care; (3) Watson reached MMI for injuries causally related to the accident by August 12, 2009; (4) Watson was not permanently and totally disabled; and (5) Watson sustained a 50% permanent partial disability to her

---

5. XTRA previously filed a Form 21 on September 2, 2009, and September 15, 2009, but filed an amended Form 21, which began the current action, on November 9, 2009.

back pursuant to section 42–9–30(21) of the South Carolina Code (Supp.2011).

In accordance with these findings, the single commissioner ordered: (1) XTRA was responsible for all causally-related medical treatment that was incurred on or before August 12, 2009; (2) Watson was entitled to future *Dodge*[6] medical treatment as needed to lessen Watson's causally-related disability from the September 18, 2007 accident; (3) XTRA's stop payment application was granted, and XTRA was entitled to stop payment of TTD effective August 12, 2009; (4) XTRA had no liability for any further TTD; and (5) XTRA must pay a lump sum payment to Watson representing compensation for 50% permanent loss of use to the back, while XTRA was allowed to take credit for all TTD paid to Watson for the period after August 12, 2009.

Watson appealed the single commissioner's order. The Appellate Panel affirmed the single commissioner in full, and this appeal followed.

## STANDARD OF REVIEW

 The South Carolina Administrative Procedures Act establishes the substantial evidence standard for judicial review of decisions by the Appellate Panel. S.C.Code Ann. § 1–23–380 (Supp.2011); *Lark v. Bi–Lo, Inc.*, 276 S.C. 130, 134–35, 276 S.E.2d 304, 306 (1981). Under the substantial evidence standard of review, this court may not substitute its judgment for that of the Appellate Panel as to the weight of the evidence on questions of fact, but may reverse when the decision is affected by an error of law. *Stone v. Traylor Bros., Inc.*, 360 S.C. 271, 274, 600 S.E.2d 551, 552 (Ct.App.2004). "Substantial evidence is not a mere scintilla of evidence, nor the evidence viewed blindly from one side of the case, but is evidence which, considering the record as a whole, would allow reasonable minds to reach the conclusions the [Appellate Panel] reached in order to justify its actions." *Broughton v. S. of the Border*, 336 S.C. 488, 495, 520 S.E.2d 634, 637 (Ct.App.1999) (internal citation omitted).

---

**6.** *Dodge v. Bruccoli, Clark, Layman, Inc.*, 334 S.C. 574, 579–80, 514 S.E.2d 593, 596 (Ct.App.1999) (holding a finding that claimant has reached MMI does not preclude an award of additional medical benefits for purposes of lessening the period of disability).

## LAW/ANALYSIS

### I. The FCE

 Watson argues the Appellate Panel erred in admitting the strength category contained in the FCE that indicates Watson was capable of light strength work. Watson asserts the vocational opinion was generated by a computer system, and XTRA offered no evidence to establish the computer was qualified as a vocational expert to give an opinion under Rule 702 of the South Carolina Rules of Evidence. We disagree.

Because the South Carolina Rules of Evidence do not apply in proceedings before the Workers' Compensation Commission, and Watson offers no other authority for this court to reverse the Appellate Panel, we affirm the decision to admit the FCE into evidence. *See Hamilton v. Bob Bennett Ford,* 339 S.C. 68, 70, 528 S.E.2d 667, 668 (2000) ("[T]he South Carolina Rules of Evidence do not apply in proceedings before the Workers' Compensation Commission."); *Hallums v. Michelin Tire Corp.,* 308 S.C. 498, 504, 419 S.E.2d 235, 239 (1992) (holding the Workers' Compensation Commission is allowed wide latitude of procedure and is not restricted to the strict rule of evidence adhered to in a judicial court); *see also Conran v. Joe Jenkins Realty, Inc.,* 263 S.C. 332, 334, 210 S.E.2d 309, 310 (1974) (holding appellant has the burden of proof to convince a reviewing court that the lower court was in error, and to do this, appellant must place in the record a sufficient foundation for his or her argument).

Accordingly, we affirm the Appellate Panel's decision to admit the strength category portion of the FCE into evidence.

### II. Permanent and Total Disability

Watson argues the Appellate Panel erred in failing to find permanent and total disability (PTD) under section 42–9–10 of the South Carolina Code (Supp.2011) or, in the alternative, section 42–9–30(21) of the South Carolina Code (Supp.2011). We disagree.

### A. Section 42–9–10

 First, Watson contends the Appellate Panel erred in failing to find PTD under section 42–9–10. We disagree.

■ Section 42–9–10 provides for PTD "when the incapacity for work resulting from an injury is total." The extent of disability is a question of fact to be proved as any other fact is proved. *Hanks v. Blair Mills, Inc.*, 286 S.C. 378, 384, 335 S.E.2d 91, 95 (Ct.App.1985). In *Wynn v. Peoples Natural Gas Co. of S. C.*, 238 S.C. 1, 11–12, 118 S.E.2d 812, 817–18 (1961), our supreme court stated:

> Disability in compensation cases is to be measured by loss of earning capacity. Total disability does not require complete helplessness.... The generally accepted test of total disability is inability to perform services other than those that are "so limited in quality, dependability, or quantity that a reasonably stable market for them does not exist."

(internal citations omitted).

Here, there is substantial evidence in the record to support the Appellate Panel's conclusion that Watson is not permanently and totally disabled. At the hearing before the single commissioner, Watson testified as to her education and work experience: (1) she graduated high school and attended several training courses in health and life insurance, as well as vocational training in secretarial duties; (2) she is versed in the operation of computers; (3) she has experience in contract negotiation, customer service, accounting, ad design, and other types of secretarial work; and (4) she has extensive experience and training in occupations of a sedentary nature. As to her physical capabilities, Watson testified: (1) she is able to drive continually for thirty to thirty-five minutes and can drive longer if she takes breaks; (2) she performs some household chores; (3) she goes grocery shopping; (4) she handles all her money and pays her bills; and (5) she no longer takes any anti-inflammatories or pain medication.

Further, both Dr. Chokshi and Shadbolt evaluated Watson and testified she could return to work in an occupation that complied with her job factor restrictions. While the dissent points out Watson's restrictions, we find Watson's testimony describing her capabilities, and the testimony of Dr. Chokshi and Shadbolt provide substantial evidence to conclude Watson is not permanently and totally disabled.

Based on the record as a whole, we find Watson failed to show that she was unable to perform services other than those

that are so limited in quality, dependability, or quantity that a reasonably stable market for them does not exist. *See Coleman v. Quality Concrete Prods., Inc.*, 245 S.C. 625, 630, 142 S.E.2d 43, 45 (1965) (holding the burden is on the employee to prove he or she is totally disabled, specifically that he or she is unable to perform services other than those that are so limited in quality, dependability, or quantity that a reasonably stable market for them does not exist). Therefore, we affirm the Appellate Panel's conclusion that Watson was not permanently and totally disabled under section 42–9–10.

## B. Section 42–9–30(21)

■ Watson also contends the Appellate Panel erred in failing to find PTD under section 42–9–30(21). We disagree.

While PTD is generally based on loss of earning capacity, section 42–9–30(21) states there is a rebuttable presumption of PTD when a claimant has 50% or more loss of use of the back. Therefore, a claimant with 50% or more loss of use of the back is not required to prove loss of earning capacity to establish PTD. *Bateman v. Town & Country Furniture Co.*, 287 S.C. 158, 160, 336 S.E.2d 890, 891 (Ct.App.1985) (holding a claimant who suffers a 50% or more loss of use of the back need not show a loss of earning capacity to recover PTD).

Here, the Appellate Panel affirmed the single commissioner's finding that Watson sustained 50% impairment to the use of her back. The Appellate Panel also agreed that while there was a presumption Watson was totally and permanently disabled under section 42–9–30(21), XTRA rebutted that presumption. We find there is substantial evidence in the record to support the Appellate Panel's conclusion that XTRA rebutted the presumption that Watson was permanently and totally disabled.

The Appellate Panel relied, in part, on the FCE, which concluded Watson is capable of assuming a position in the light strength category. The Appellate Panel also reviewed the testimony of Dr. Chokshi who stated, "As long as the work is within the particular restrictions, I believe it is reasonable for her to continue working." Dr. Chokshi also determined that according to the American Medical Association (AMA) guidelines, Watson had a 10% impairment rating of the whole

person. Shadbolt testified he believes Watson could perform a sedentary job if she was able to stand up and sit down periodically. Further, Watson testified she is willing to work within her strength restrictions, but admitted she has not looked for any employment within those restrictions.

We recognize the testimony of Brown, the vocational analyst, who asserted the conclusions of the FCE were inconsistent, and Watson was permanently and totally disabled. However, the Appellate Panel is reserved the task of weighing the evidence, and it ultimately concluded Watson was not permanently and totally disabled. *See Shealy v. Aiken Cnty.*, 341 S.C. 448, 455, 535 S.E.2d 438, 442 (2000) (holding the appellate panel is specifically reserved the task of assessing the credibility of the witnesses and the weight to be accorded evidence). We find the Appellate Panel's conclusion that Watson is not permanently and totally disabled is supported by substantial evidence in the record. Accordingly, we affirm the Appellate Panel.

## III. Credit for TTD

■ Watson argues the Appellate Panel erred in granting XTRA credit for all TTD paid after Watson reached MMI on August 12, 2009. We disagree.

We find substantial evidence in the record to support Watson reached MMI; therefore, we hold XTRA is entitled to recover any payment it made to Watson for TTD after that date. Dr. Chokshi found Watson reached MMI on August 12, 2009. On appeal, Watson does not object to Dr. Chokshi's finding of MMI, but instead argues equity demands that XTRA not receive credit for payments it made to Watson after she had reached MMI. Because equity follows the law, XTRA is entitled to credit for any TTD compensation payments it made to Watson after the date of MMI. *See Curiel v. Envtl. Mgmt. Servs. (MS)*, 376 S.C. 23, 29, 655 S.E.2d 482, 485 (2007) ("[T]he date of maximum medical improvement signals the end of entitlement to temporary total disability benefits."); *Smith v. S.C. Dep't of Mental Health*, 335 S.C. 396, 398–401, 517 S.E.2d 694, 695–97 (1999) (finding employer was entitled to stop payment of temporary total disability benefits upon a showing that the claimant has reached maximum medical

improvement); *Regions Bank v. Wingard Props., Inc.,* 394 S.C. 241, 254, 715 S.E.2d 348, 355 (Ct.App.2011) (holding a court may not ignore statutes, rules, and other precedent when providing an equitable remedy).

Accordingly, the Appellate Panel's decision is

**AFFIRMED.**

SHORT, J., concurs.

GEATHERS, J., concurs in part, and dissents in part.

GEATHERS, J., concurring in part and dissenting in part.

Respectfully, I concur in part and dissent in part. I concur with the majority's holdings that: (1) Watson's strength assessment was properly admitted into evidence, and (2) the employer is entitled to a credit for payment of temporary disability benefits made after Watson reached maximum medical improvement. I respectfully dissent, however, from the majority's holding that Watson is not permanently and totally disabled, pursuant to sections 42–9–10 and 42–9–30(21) of the South Carolina Code (Supp.2011).

In South Carolina, there are two models of workers' compensation; the first, an economic model, compensates workers for reductions in earning capacity, while the second is based on the degree of medical impairment:

"South Carolina's workers' compensation law represents a combination of two competing models of workers' compensation, one economic and the other medical." *Stephenson v. Rice Servs., Inc.,* 323 S.C. 113, 116, 473 S.E.2d 699, 700 (1996). Under the more traditional economic theory, the goal of worker's [sic] compensation law is to compensate workers for reductions in their earning capacity caused by work-related injuries. *Id.* This is the criterion for compensation under the Workers' Compensation Act. *See* S.C.Code Ann. § 42–1–120 (1985) ("The term 'disability' means incapacity because of injury to earn the wages which the employee was receiving at the time of injury in the same or any other employment.").

"Notwithstanding the definition of disability in section 42–1–120, South Carolina's workers' compensation law also recog-

nizes a competing concept of disability that is tied to medical impairment rather than to wage loss or to any reduction in earning capacity. *The schedule[d] injuries, which typically provide for fixed awards of workers' compensation based on degrees of medical impairment to certain listed body parts, are compensable without regard to whether the employee is able to continue working at the same job.* In other words, with schedule[d] injuries, the fact the employee still is able to work constitutes no bar to compensation." *Stephenson,* 323 S.C. at 117, 473 S.E.2d at 701 (emphasis added). Under the medical theory, the focus is on the medical impairment of the employee. *Id.*

*Simmons v. City of Charleston,* 349 S.C. 64, 73–74, 562 S.E.2d 476, 480–81 (Ct.App.2002).

While an award under general disability requires proof of a loss in earning capacity, an award under a scheduled loss does not require such proof:

Under our Worker's Compensation Act, a claimant may proceed under § 42–9–10 or section 42–9–20 to prove a general disability; *alternatively,* he or she may proceed under § 42–9–30 to prove a loss, or loss of use of, a member, organ, or part of the body for which specific awards are listed in the statute. It is well-settled that an award under the general disability statutes must be predicated upon a showing of a loss of earning capacity, whereas an award under the scheduled loss statute does not require such a showing. The commission may award compensation to a claimant under the scheduled loss statute rather than the general disability statutes so long as there is substantial evidence to support such an award.

*Fields v. Owens Corning Fiberglas,* 301 S.C. 554, 555, 393 S.E.2d 172, 173 (1990) (emphasis added) (citations omitted). In my opinion, Watson is permanently and totally disabled pursuant to both statutory models (economic and medical).

The following facts are undisputed: (1) in a workplace setting, Watson now can sit continuously for no longer than three minutes; (2) in a workplace setting, Watson now can stand continuously for no longer than twelve minutes and can walk no farther than 0.10 mile; (3) Adger Brown, the vocational analyst who reviewed Watson's restrictions, found these job

factor restrictions rendered Watson permanently and totally disabled; and (4) when claimant returned to her job, which is classified as sedentary, her employer sent her home, stating there was no work available that could accommodate Watson's job restrictions.

As stated by the majority, the standard for determining total disability under section 42-9-10 is the inability to perform services other than those that are so limited in quality, dependability, or quantity that a reasonably stable market for them does not exist. *Wynn v. Peoples Natural Gas Co. of S. C.*, 238 S.C. 1, 12, 118 S.E.2d 812, 818 (1961). In other words, "[t]he ability to perform limited tasks for which no stable job market exists does not prevent an employee from proving total disability." *Simmons*, 349 S.C. at 74, 562 S.E.2d at 481 (citation omitted).

The majority reasons that because Watson's strength rating was "sedentary" and because her work at the time of injury was also sedentary, Watson remains capable of returning to sedentary work within the restrictions of sitting no more than three minutes and standing no more than twelve minutes. However, the very existence of these restrictions beg the question of whether they so limit the quality, dependability, or quality of the services Watson is able to perform that there exists no stable job market for those services. The record includes compelling evidence that the sitting and standing restrictions on Watson's work renders her services unmarketable. When Watson attempted to return to her sedentary job, unsurprisingly, her employer informed her that it could provide no work within her job restrictions.

The majority points out the fact that Watson had previously worked as a secretary. However, there is no relevant distinction between the nature of Watson's former job and that of a secretary. Watson's secretarial skills, which also require "sedentary" strength, do not mitigate the impact of the restrictions on her sitting, standing, and walking—basic requirements of all sedentary jobs. Contrary to the majority viewpoint, I would contend there is no "reasonably stable" market for services that can be performed by this claimant. In my opinion, Watson cannot perform workplace services other than those that are "so limited in quality, dependability, or quantity

that a reasonably stable market for them does not exist." Accordingly, I would hold that Watson is permanently and totally disabled pursuant to section 42–9–10.

I also disagree with the majority's analysis under the scheduled disability statute, section 42–9–30(21). It is particularly significant that section 42–9–30(21) provides a rebuttable presumption of total and permanent disability when a claimant has experienced a loss of use of 50% or more of the back. Here, the Commission found that, as a result of Watson's workplace accident, Watson had sustained a 50% loss of use to her back, which triggered the presumption that Watson is totally disabled. The majority found the employer successfully rebutted this presumption by relying on Dr. Chokshi's statement that Watson can work within her restrictions and Watson's testimony that she was willing to work within her restrictions. In my opinion, these statements are not probative of the existence of a stable market for work as severely restricted as Watson's work is. *See McCollum v. Singer Co.,* 300 S.C. 103, 107, 386 S.E.2d 471, 474 (Ct.App.1989) ("Under Workers' Compensation Law 'total disability' does not require complete, abject helplessness. Rather it is an inability to perform services *other than those that are so limited in quality, dependability, or quantity that no reasonably stable market exists for them."* (emphasis added)). There is simply no probative evidence in the record to rebut the presumption of Watson's total disability under section 42–9–30(21). *Id.* (rejecting an employer's argument that the claimant's ability to drive a car for an hour, walk for ten minutes, and go shopping made the claimant employable).

For the foregoing reasons, under each of the workers' compensation models—economic and medical—I would reverse the Commission's holding that Watson is not totally and permanently disabled.